# TOMPKINS v. LITTLE ROCK AND FORT SMITH RAILWAY.

# WILLIAMS v. LITTLE ROCK, MISSISSIPPI RIVER AND TEXAS RAILWAY.

APPEALS FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF ARKANSAS.

Nos. 70, 71. Argued January 17, 18, 1888. — Decided March 19, 1888.

The statute of the State of Arkansas of July 21, 1868, to aid in the construction of railroads, and the statute of that State of April 10, 1869, to provide for payment of interest upon the bonds of the State issued in aid of such construction, created no lien upon the property of a railroad company for whose benefit such state bonds were issued, in favor of the holder of the bonds, which, after a sale under foreclosure of a mortgage upon the property remained a lien upon it in the hands of the purchaser at the foreclosure sale.

IN EQUITY. The case is stated in the opinion of the court.

*Mr. John R. Dos Passos* and *Mr. John McClure* for appellant. *Mr. U. M. Rose* and *Mr. Attorney General* were with them on the brief.

*Mr. C. W. Huntington* and *Mr. John F. Dillon* for appellees.

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

These cases may properly be considered together. The material facts are these:

The Little Rock and Fort Smith Railroad Company was incorporated by the State of Arkansas, January 22, 1855, to build and operate a railroad in that State from Little Rock, by the way of Van Buren, to Fort Smith. The Mississippi, Ouachita and Red River Railroad Company was also incorporated by the State on the same day, to build and operate a railroad from the Mississippi River near Gaines' Landing,

through or near Camden, to some point on the Red River, at or near Fulton, and thence to the boundary line between Arkansas and Texas. The Little Rock, Pine Bluff and New Orleans Railroad Company was organized November 23, 1868, under the general railroad law of Arkansas, passed July 23, 1868, to build and operate another railroad from Little Rock, through or near Pine Bluff and Monticello, to the state line, with a branch from Pine Bluff to Eunice.

On the 21st of July, 1868, the General Assembly passed " an act to aid in the construction of railroads." By this act the State, " for the purpose of securing such lines of railroad in this State as the interests of the people may from time to time require," pledged itself " to issue to each railroad company or corporation, which shall become entitled thereto, the bonds of this State, in the sum of one thousand dollars each, payable in thirty years from the date thereof, with coupons thereto attached, for the payment of interest on the same in the city of New York, semi-annually, at the rate of seven per cent per annum, in the sum of fifteen thousand dollars in bonds for each mile of railroad which has not received a land grant from the United States, and ten thousand dollars in bonds for each mile of railroad which has received a land grant from the United States, on account of which such bonds shall be due and issuable, as provided." To get the aid application was required to be made to the Board of Railroad Commissioners for " the loan of state credit herein provided for," and its approval by that board obtained.

The bonds were to be under the seal of the State, and attested by the Secretary of State, and they, or the avails thereof, were to be used " solely for the purpose of providing for the ironing, equipping, building, and completing said road." They were to be issued only as each ten miles or more of the road was prepared for the iron rails.

Sections 7 and 8, which are principally relied on as the ground of recovery, are as follows:

" Sec. 7. Be it further enacted, That the Legislature shall from time to time impose upon each railroad company, to which bonds shall have been issued, a tax equal to the amount

of the annual interest upon such bonds then outstanding and unpaid, which tax may be paid in money or in the past due coupons of the State at par, and after the expiration of five years from the completion of said road the Legislature shall impose an additional special tax of two and one-half per cent per annum upon the whole amount of state aid granted to such company, payable in money or in the bonds and coupons of the State at par; and, if in money, the same shall be invested by the treasurer of the State in the bonds of the State at their current market value. The taxation in this section provided to continue until the amount of bonds issued to such company, with the interest thereon, shall have been paid by said company as herein specified, in which case the said road shall be entitled to a discharge from all claims or liens on the part of the State: *Provided,* That nothing herein contained shall be so construed as to deprive any company, securing the loan of the bonds of the State herein provided for, from paying the whole amount due from such company to the State at any time in the bonds of the State loaned in aid of railroads or the coupons thereon, or in money.

"Sec. 8. Be it further enacted, That in the case said company shall fail to pay the taxes imposed by the preceding section, at the time the same become due and for sixty days thereafter, it shall be the duty of the treasurer of the State, by writ of sequestration, to seize and take possession of the income and revenues of said company until the amount of said defaults shall be fully paid up and satisfied, with costs of sequestration, after which said treasurer shall release the further revenues of said company to its proper officers."

In this statute the tax provided for in § 7 was to be imposed by the legislature from time to time, but on the 10th of April, 1869, another act was passed, "to provide for paying the interest of the bonds to aid in the construction of railroads," by which it was enacted that the interest on all bonds issued under the act of 1868 should be made payable on the first day of April and the first day of October in each year, and it was made the duty of "the auditor of public accounts, on or before the first day of June in each year," to "certify

to the treasurer the amount of bonds issued to each railroad company, the amount of semi-annual interest that will accrue thereon — that is to say, the amount of interest the State will have to pay on the first day of October of that year, on the bonds issued to each of said railroad companies — and the amount of tax required from each of said railroad companies to pay the same, which tax shall be deemed due and payable on the thirtieth day of June of that year. Similar provision was also made for the interest falling due in April. Upon the receipt of a certificate from the auditor, it was made the duty of the treasurer to "cause notice to be served upon each railroad company, on or before the twentieth day of June," or the twentieth day of December, as the case might be, "in each year, specifying the amount of tax to be paid, which amount shall be the interest on said bonds for the said period, and demanding payment of the same into the treasury" at the appointed time. If default occurred in the payment of the tax, and it continued for sixty days, it was made the duty of the treasurer, "through the attorney general, to make and file a petition, under the seal of the treasurer's office, in the Pulaski Chancery Court, setting forth the amount due and the fact of such default, praying the issue of the writ of sequestration contemplated in said act, and the appointment of a receiver, to be named in said petition, to receive in his behalf the revenue and income of said company, for the purpose specified in said act, which writ shall issue upon the filing of the petition for the same." Upon the issue of the writ so ordered, the receiver therein named was required to "take possession of all the income and revenues of the defaulting company, with authority to demand and receive all moneys coming to the same from the operation of such road;" and it was further made "the duty of all officers of said company to return all moneys to him, for receiving which he may require the submission of all necessary books, papers, and accounts to him, and may examine any and all persons under oath, and any person making false returns, or failing to pay over moneys, shall be deemed guilty of a misdemeanor, and any person swearing falsely shall be declared guilty of perjury." Section 5 of this act was as follows:

"Sec. 5. That such receiver shall give such bond as the treasurer may require, shall be removable at the pleasure of the treasurer, and a successor appointed, to be approved by the chancellor. He shall, at the end of each month, make full report and return to the treasurer of all moneys received by him, with his estimate of the necessary cost of operating said road, which, on the approval and order of said treasurer, shall be paid out of the money so returned, the surplus or net proceeds to be applied in the discharge of the tax due and unpaid; and shall so continue until such amount in default shall be paid, with the reasonable cost of sequestration, to be taxed and certified by the chancellor, when the treasurer shall account with said company and withdraw said receiver from the management of its affairs."

The Little Rock and Fort Smith Railroad Company received a land grant from the United States, and on the 28th of April, 1869, its application to the State for "the benefits of" the act of July 21, 1868, was granted as a "loan of state credit." Afterwards, beginning April 2, 1870, state bonds to the amount of one million dollars were issued to the company, as its road was built, in the following form:

"No.——                                    No.——
"$1000.          United States of America.          $1000.

"It is hereby certified that the State of Arkansas is indebted unto the Little Rock and Fort Smith Railroad Company, or bearer, in the sum of one thousand dollars, lawful money of the United States of America, redeemable at the city of New York thirty years from the date hereof, with interest at the rate of seven per cent per annum, payable semiannually, in the city of New York, on the first day of April and October in each year, on the presentation of the proper coupons hereto annexed. The faith and credit of the State are hereby solemnly and irrevocably pledged for the payment of the interest and redemption of the principal of this bond. Issued in pursuance of an act of the General Assembly of the State of Arkansas, approved July 21, 1868, entitled 'An act to aid in the construction of railroads,' the said act having been sub-.

mitted to and duly ratified by the people of the State, at the general election held November 3, 1868.

"In witness whereof, the governor of the State has signed this bond, the state treasurer has countersigned the same, and the seal of the State has been affixed at the city of Little Rock, Arkansas, this first day of April, 1870:

[SEAL.]        "POWELL CLAYTON, Governor.
               "R. J. T. WHITE, Secretary of State.
               "HENRY PAGE, Treasurer.
               "J. R. BERRY, Auditor."

Each of said bonds at the time of their issue had sixty interest coupons thereto attached, numbered from one to sixty inclusive, and which, with the exception of the time of payment and number thereon, were as follows, to wit:

"$35.00.                                            $35.00.

"The treasurer of the State of Arkansas will pay to bearer thirty-five dollars, in the city of New York, on the first day of October, 1870, being semiannual interest due on bond No. ——.

"L. R. & F. S. R. R.         J. R. BERRY, Auditor."

On the 22d of December, 1869, the railroad company executed a mortgage on its railroad and the income thereof to Henry W. Paine and Samuel T. Dana, to secure a proposed issue of bonds to the amount of $3,500,000, and on the 20th of June, 1870, another mortgage to the same parties on its land grant to secure another proposed issue of $5,000,000.

Interest was paid on the state bonds up to and including April 1, 1873. Default having been made in the payment of interest upon the bonds issued under the railroad mortgage, a suit was begun by the trustees, May 12, 1874, for the foreclosure. To this suit the State was not a party, but in the bill the fact that state aid had been granted to the company was set forth, and the prayer was for a sale "subject to the lien of the State of Arkansas, if your honor shall find and decree that any lien existed in favor of said State prior to the lien created

by said deed of mortgage." Upon this bill a decree was rendered *pro confesso*, directing a sale of the mortgaged property, but making no decision and giving no directions as to the suggestion of a lien in favor of the State. Under this decree the property was bought by a committee of the bondholders for a nominal sum, and they organized a new corporation under the laws of Arkansas by the name of the Little Rock and Fort Smith Railway, to take the title, the original bondholders, or such of them as elected to come in, being the stockholders. Afterwards the property purchased was conveyed to the new corporation.

On the 15th of March, 1869, state aid was awarded to the Little Rock, Pine Bluff and New Orleans Railroad Company under the act of July 21, 1868, to the amount of $1,200,000, and on the 25th of June, 1870, to the Mississippi, Ouachita and Red River Railroad Company to the amount of $600,000. On the 20th of April, 1870, the Little Rock, Pine Bluff and New Orleans Company mortgaged its railroad and income to Benjamin A. Farnham and David B. Sickels to secure an issue of $1,200,000 of bonds, and on the 3d of May, 1870, the Mississippi, Ouachita and Red River Railroad Company mortgaged its road and income to the same trustees to secure another issue of bonds, amounting to $2,040,000. In October, 1873, these companies were consolidated into one corporation, under the name of the Texas, Mississippi and Northwestern Railroad Company. Default having been made in the payment of interest on these bonds, suits were begun by the trustees, March 15, 1875, to foreclose the mortgages under which the two roads were sold by order of the court, and afterwards conveyances made to the Little Rock, Mississippi and Texas Railway. The proceedings in these suits were substantially the same as in that against the Little Rock and Fort Smith Railroad Company.

No interest was paid on the state bonds after April, 1873, and at its May term, 1877, the Supreme Court of the State decided that the bonds were void, because issued in violation of one of the provisions of the Constitution of the State. *Arkansas* v. *Little Rock, Mississippi & Texas Railway,* 31

Arkansas, 701. On the 29th of May, 1874, the legislature repealed the act of April 10, 1869, being the act above mentioned, "to provide for paying the interest on bonds issued to aid in the construction of railroads."

William H. Tompkins is the owner of 2286 coupons cut from the bonds of the State issued to the Little Rock and Fort Smith Railroad Company which his mother bought in open market in 1870, without notice, and which she gave to him on his coming of age in 1875 or 1876, and he, on the 15th of March, 1882, began the suit against the Little Rock and Fort Smith Railway, in which he appears here as appellant, in the Circuit Court of the United States for the Eastern District of Arkansas, "on behalf of himself and all holders of bonds issued by the State" to the Little Rock and Fort Smith Railroad Company, the object of which is to subject the earnings of the railroad formerly owned by the Little Rock and Fort Smith Railroad Company to the payment of the interest due on the state aid bonds, and to require the new or reorganized company to account for the earnings since the road has been in its possession, and apply the amount due in the same way.

William S. Williams is the owner of bonds issued to the Little Rock, Pine Bluff and New Orleans Railroad Company to the amount of $67,000, and of bonds issued to the Mississippi, Ouachita and Red River Railroad Company to the amount of $24,000, on all of which coupons No. 6 and thereafter remain unpaid. These bonds, with the coupons attached, he bought in open market at the current price, after the decision in *Arkansas* v. *The Little Rock, Mississippi River and Texas Railway*, above referred to, but without notice of any want of power or defect in the issue of the bonds other than is shown on their face. The suit in which he is here as appellant was brought in the same court, in the same way as that of Tompkins, on the 29th of January, 1883, against the Little Rock, Mississippi and Texas Railway to obtain substantially the same relief. Both bills were dismissed after hearing, and from decrees to that effect these appeals were taken. Two opinions were filed in the court below, one by the presiding

Justice in favor of the decree, and reported in 18 Fed. Rep. 344, and the other by the District Judge against it, and reported in 21 Fed. Rep. 370.

The liability of the present companies, or the roads in their hands, for the payment of the state bonds depends entirely on the operation and effect of the acts of July 21, 1868, and April 10, 1869, under which the bonds were issued, and they, being in *pari materia*, are to be construed together. The position taken in argument, as stated in the brief of counsel, is, that the acceptance of the bonds by the several companies created "an equitable or statutory lien or charge in favor of the State, upon the income and revenue of the roads, to the extent necessary to meet the interest and principal upon the bonds as they accrued and became due," and that "the bond-holders can avail themselves of the lien." This lien on the income and revenue, it is further claimed, is in law and in fact a charge on the roads themselves, which attached as soon as the awards of aid by the Board of Railroad Commissioners were made to the several original companies, and can be enforced against subsequent incumbrancers or purchasers until the debt of the company to the State is paid in full.

It cannot be denied that the bonds were issued as "a loan of state credit," and that the original companies were bound to hold the State harmless from all liability on the amounts taken by them respectively. This might be done by paying to the State at the times specified the taxes imposed under the law, either in money or in the bonds and coupons of the State at par, or by paying at any time the whole amount of principal and accrued interest then unpaid, in money or in the bonds of the State loaned in aid of railroads or the coupons thereon. Such is the express provision of § 7 of the act of 1868. The bonds were bonds of the State, "pure and simple." They carried on their face no express obligation of the railroad company to the holder. The promise made by the company on the acceptance of the bonds was to pay the State, not the bondholder. The failure of the company to meet its obligations to the State did not operate in any manner to relieve the State from its liability on the bonds. The debt of

the state still remained and was the only debt the bonds expressed on their face. The debt of the company was to the State for the bond, not to the bondholder on the bond. Payment to the State discharged the obligation of the company.

What we have thus far said relates to the bonds considered as a valid and constitutional obligation of the State. If they were invalid, and relief was sought on that account against the company selling them, the liability would be, not on the bonds, but for the money had and received on their sale. That certainly would be the debt of the original company alone, and in no way binding on a purchaser of its property. In *Railroad Companies* v. *Schutte*, 103 U. S. 118, the object was to enforce the statutory mortgage. the company actually gave the State as security for the issue of the bonds, not to recover the money received for them. There can be no liability of the new companies in these cases, therefore, unless the acceptance of the bonds by the old companies created the lien which is now contended for on the railroads or their income. In the *Schutte* case there was the lien, and it was enforced. The question now is, whether a lien was created in these cases which, under the rule in that case, will inure to the benefit of the bondholders.

If we understand the argument for the appellants correctly, it is, that because the requisition which is to be made on the company to meet the instalments of interest as they mature, and to provide a fund to pay the principal when it falls due, is called in the statute *a tax*, which may in case of default be collected by a sequestration of the income and revenue of the company, it necessarily implies a lien on the property from which the income and revenue are to be derived, as security for the payment of the debt; and that this view of the case is strengthened by the further provision for " a discharge of all claims and liens on the road" when the payment is made, which would be unnecessary if it was not intended that a lien on the road should be, and was in fact, created in favor of the State.

It is true that the requisition provided for is called a tax in

the statute, but that does not make it a tax in the ordinary sense of that term.   By statute in Arkansas, "all property, whether real or personal," except such as shall be "expressly exempted," is "subject to taxation," and must "be entered on the list of taxable property for that purpose."   Gantt's Dig., § 5048.   Each owner is required to list his own property, (§ 5066,) and, when valued in the way provided by law, the county clerk is "to make out . . . a complete list or schedule of the taxable property in his county, and the value thereof," placing each separate lot or tract of real property opposite the name of its owner.   The aggregate value of the personal property of each owner is also to be set opposite his name.   § 5133.   This being done, the clerk is to enter the amount of taxes imposed upon each parcel of property, and deliver the list to the proper officer for collection.   §§ 5137, 5139.   It is then provided by § 5153 that "the lien of the State for the taxes levied for all purposes in each year shall attach to all real and personal property on the first Friday after the first Monday in October in each year, and shall continue until such taxes, with any penalty that may accrue thereon, shall be paid."   Taxes upon personal property, if not paid by the owner, may be collected by distraint.   § 5173. Taxes on land, not voluntarily paid, are to be collected by a sale of the property.   §§ 5185 to 5188.

Such taxes are undoubtedly liens on the property taxed, for they are in express terms made charges thereon, and there is something directly pointed out to which a lien may attach. The lien is not on the property of the owner generally, but only on that upon or against which the tax is charged.   Taxes are also levied and collected in Arkansas for privileges, (§§ 5050 to 5054,) but these are not liens on the property of him to whom the privilege is granted.   He may be prevented from exercising the privilege until the tax is paid, but the tax is certainly no lien on his property until a seizure has actually been made under some appropriate form of proceeding for its collection, or something else done in that behalf.

In the present case the tax provided for is not on the property of the company, and it has none of the qualities of

a tax for revenue. It is in reality nothing but a way of fixing the amount due at a particular time from the company to the State on account of the loan of credit under the statute, and demanding its payment. The object is to collect a debt due, not to require a contribution from the company for the public necessities. The obligation to pay grows out of a private contract between the State and the company, not out of the political relations between a sovereign and his people. The rights of the respective parties depend on the terms of the agreement they have entered into, not on the reciprocal duties between a State in its public capacity and its citizens. An exaction by the State under such circumstances and for such purposes is not made a lien on the property of the person who is to pay the money by simply calling it a tax. To create a charge there must be something more than the mere giving of a name to the requisition that is made. In short, the statute which authorizes the requisition must in express terms or by reasonable implication establish a lien. That has been done in Arkansas so far as taxes for revenue are concerned. The question to be determined is whether the same thing has been done in respect to the liability of railroad companies to the State under the statutes now in question.

Certainly no such lien has been created in express terms. A provision for the "discharge from all claims or liens" does not of itself establish a lien. If the lien does not exist without, such a provision will not create one. The provision may be used in aid of construction if there is doubt, but not as an affirmative grant of a positive right.

Is there anything, then, in the rest of the statute from which the creation of a lien may be reasonably implied? Before the loan could be obtained it was necessary for the company to make a statement to the Board of Railroad Commissioners, setting forth its charter and organization, a map of its line, and the progress made in construction, its financial condition and resources, and for it to furnish such other information as the case might require. The board was also to inspect the road from time to time, and to indicate to the governor how the aid was being used and applied. If

improperly used, the governor was authorized to withhold all or any part of the bonds, and to take such other steps as he might deem proper, to the end that the bonds should not be squandered. Any action of that kind on the part of the governor was to be reported to the General Assembly, which was empowered to take such steps as might be necessary to protect the interests of the State. If the company failed to complete its road within the time limited by the statute, it was to forfeit its charter and franchises to the State. In all this we see no intention of establishing a lien on the road as security for the loan which was actually made. A right to forfeit a charter and its franchises for not completing that which had been begun does not necessarily imply a prohibition against a sale or incumbrance of property acquired before a forfeiture was in fact enforced. The taking away of the franchises may, under some circumstances, affect the value of the property in the hands of a purchaser, but it cannot ordinarily deprive him of his title. A forfeiture of the charter does not necessarily transfer the road built under it to the State, or give the State any rights therein.

The whole matter, therefore, depends, so far as the act of 1868 is concerned, on the operation and effect of § 8, which provides that if the company fails to pay "the taxes imposed" by § 7, "it shall be the duty of the Treasurer of State, by writ of sequestration, to seize and take possession of the income and revenues of said company until the amount of said defaults shall be fully paid up and satisfied, with costs of sequestration, after which said treasurer shall release the further revenues of said company to its officers." The act of 1869 provides the machinery for obtaining this writ of sequestration and carrying it into effect, through a receiver to be appointed by the Pulaski Chancery Court. This receiver is authorized to demand and receive all moneys coming to the company from the operation of the road. To accomplish this it was made the duty of the officers of the company to return all moneys to him, with power on his part to require the submission to his inspection of books, papers, and accounts, and to examine persons under oath. Operating expenses were

to be paid by the receiver, on the approval of the Treasurer of State, out of the moneys turned over to him, and only the surplus or net proceeds applied in discharge of the tax. When the tax was satisfied the treasurer was required to "account with said company, and withdraw said receiver from the management of its affairs."

This, it is contended, "created and designated a fund from which the bonds were to be paid, and in case of default named a person who should seize that fund and apply it to the payment of the interest and the principal of the bonds." Such being the case, it is argued, on the supposed authority of *Ketchum* v. *St. Louis*, 101 U. S. 306, that the statute created a lien on the entire income and revenue of the company for the payment of the debt, and as the company relied exclusively on its road for its income and revenue, this lien extended to the road itself as the thing out of which the earnings must necessarily come, and that, too, notwithstanding the road has passed into other hands.

We do not understand that the case relied on warrants any such conclusion. Its facts were peculiar. The Pacific Railroad was mortgaged to the State of Missouri to secure a loan of state aid bonds amounting to $7,000,000. It was unfinished and more money was needed for its completion. Authority was then given the company by the State to issue more bonds for that purpose, to be secured by a first mortgage on a part of the line, which should be superior in lien to that already existing in favor of the State as security for the original loan. Under this legislation a fund commissioner was appointed, who had acquired, by authority of the statute, for the security of the State, "complete control of the earnings and income arising from the property." In this condition of affairs the State was invaded by armed forces during the late civil war, and while the invasion continued much of the property belonging to the company, including bridges, depots, machine shops and track, was destroyed. To raise the money to repair these damages and put the road again in a condition for use, the company applied to the county of St. Louis for a loan of $700,000 of county bonds. In aid of this application the

legislature of Missouri passed a statute authorizing the county to issue the bonds, " under such conditions as may be agreed upon between the said County Court and the Board of Directors of the Pacific Railroad Company," and directing that " the fund commissioner of the Pacific Railroad, or such person as may at any time hereafter have the custody of the funds, of the said railroad company, shall, every month after said bonds are issued, pay into the county treasury of St. Louis County, out of the earnings of said Pacific Railroad, $4000, and $1000 additional in each month of December, to meet the interest on the said seven hundred bonds ; said payments to continue until said bonds are paid off by said Pacific Railroad." This act was accepted by the railroad company, and the bonds were loaned by the county to the company, under a special arrangement in accordance with its provisions. The fund commissioner had at the time full control of the earnings and income under the provisions of the previous statute. What was done under these circumstances was held to be " not a simple, naked covenant to pay out of a particular fund ; but the act, being accepted by the parties interested, operated as an equitable assignment of a fixed portion of the fund — an assignment which became effectual without any further intervention upon the part of the debtor, and which the party holding the funds of the company, whether the fund commissioner, or some other person, could respect without liability to the debtor for so doing. It was an arrangement based on a valuable consideration, which neither the State nor the company, nor both, nor parties claiming under either, with notice, could disregard without the assent of the county, expressed by those who had authority to bind it. It was an engagement to pay out of a specially designated fund, accompanied by express authority to its custodian to apply a specific part thereof to a definite object, in the accomplishment of which all the parties to the arrangement were directly interested." In other words, it was a specific appropriation by statute of a fixed and definite portion of the future earnings of the railroad to a particular purpose, with an express statutory provision for a custodian of the earnings as they accrued, whose duty it should

be to apply this specified portion in this specified way. No
further action of the company was required. The law made
it the duty of the custodian of the earnings of the road, who-
ever he might be, to use this definite amount thereof in this
definite way and in no other way whatever, so long as the
debt remained. The effect of this was to charge the road as a
road, into whosesoever hands it might come, with the payment
of this amount of money each month out of its current earn-
ings. If the earnings came into the hands of the person or
corporation owning the road for the time being, and the pay-
ments were not made as the law required, then some other
custodian of the earnings — some other trustee — could be
appointed by the proper judicial tribunal, who would obey the
law in that behalf.

In the present case, however, there is no specific appropria-
tion of the earnings of the road. The company is required to
pay what is called the tax to enable the State to meet the
semiannual instalments of interest on the state bonds and
provide a fund for the redemption of the principal whenever
it falls due. No specific amount of the earnings of the road is
specially set apart by law for that purpose. There is no pro-
vision for a custodian of the earnings, whose duty it shall be
to pay to the State *out of the earnings* as they accrue any def-
inite amount on the days named. The tax is to be paid by the
company on certain specified days, but there is no statutory ap-
propriation of earnings for that purpose. If the company
fails to meet the tax as it falls due, " the income and revenues
of the *said company* " may be sequestered. Under the opera-
tion of this sequestration the receiver to be appointed may
" take possession of all the income and revenue of said default-
ing company, with authority to demand and receive all mon-
eys coming to the same from the operation of such road; "
but this falls very far short of a specific appropriation of the
earnings of the road as they accrue, so that they can be de-
manded under the statute as earnings of the road without se-
questration. Under the law which was the subject of consid-
eration in *Ketchum's* case, there was no need of sequestration,
because the part of the earnings of the road to be reached was

always in equity the property of the county, and the remedy applied was only such as was necessary to enable the county to reduce its own property to its own possession. Here, however, the writ of sequestration is given as a means of enabling the State to collect a debt, not to recover possession of its property. True, in the process of sequestration the State is authorized, through its receiver, to demand and receive the moneys coming to the company from the operation of the road, but this is for the purpose of enabling the State to subject that particular kind of property belonging to the company to the payment of its debt, not to get possession of anything which actually belonged to the State irrespective of its rights under the sequestration proceedings. It is true, also, that in executing its writ of sequestration, the State could, through its receiver, direct the officers of the company as to the disposition of the current earnings of the road, and thus to a certain extent assume the management of the company's affairs. This was not, however, for the purpose of enabling the State to get possession of its own property, but of compelling the company to apply its property to the payment of its debts. Certainly, if A owes B a debt, and agrees that if the debt is not paid at maturity B may apply to a proper judicial tribunal for a receiver to collect the rents of a certain building which he then owned, and apply them on the debt until it is discharged in full, it would not be claimed that B had acquired a lien on the building, or even on the rents, until he had at least commenced proceedings to subject the rents under the agreement. The agreement alone did not make the rents the property of B, or charge the building as security for their payment to him. The rents belonged to A until default in the payment of the debt, and until B took steps to reduce them to possession. If in the meantime the building should be sold by A there would be no rents which B could subject under his agreement, because it was only rents due to A himself that he could give B the right to collect. In *Ketchum's* case the earnings of the road to the extent that they had been specifically appropriated to the county of St. Louis never did belong to the company after the bonds were accepted, and the grant of the earnings was in equity a

grant of such an interest in the road as was necessary to produce the earnings. Hence, a conveyance of the road afterwards to one with notice was necessarily subject to the prior equitable charge on the road which had been created in favor of the county. But here there was never any grant of earnings, and consequently there was never any grant of an equity in the road. The case stands precisely as it would if, instead of a writ of sequestration, it had been agreed that the Pulaski Chancery Court might, on application of the Treasurer of State, issue an ordinary writ of *fieri facias* to subject the property of the company to the payment of the amount which was then due. No one could properly claim that in such a case any lien in favor of the State existed which would prevent an alienation of its property by the company before steps were taken to get the execution. The writ of sequestration actually provided for was to issue as an appropriate form of execution to subject any "income and revenue" which the company then had to the payment of its debt then due, and in the income and revenue of the company that might be thus subjected was included "all moneys coming to the same from the operation of such road," that is to say, the road in aid of the construction of which the loan of credit was made. But if there were then no moneys coming, or which could be rightfully made to come, to the company from the operation of the road, then there was nothing of that kind of property which could be subjected to the writ. And they neither could come, nor be made to come, to the company unless the original company to which the loan was made and by which the obligation was incurred either owned the road itself or had passed it to another, coupled with a condition that its earnings should be subject to the writ, or something equivalent.

We agree with counsel for the appellants, that if, on an examination of the statutes, read in the light of the circumstances which surrounded the legislature at the time of their enactment, it appeared to have been the intention to charge the road of the company as a road with a liability for the repayment of the loan to be made, it would be the duty of a court of equity to do everything in its power which was neces-

sary to enforce that charge.   And it may also be true that the courts ought to construe the statutes liberally with a view to the establishment of such a charge as against the company itself or those claiming under it, because, if the charge was actually created by the statutes, those dealing with the company were bound to take notice of it.   But after a careful consideration of the statutes, and construing them liberally in favor of the State, we have been unable to find that any such intention did in fact exist.   There was a plain and simple way in which such a lien could be created, and that was by providing in express terms for it.   That way had been adopted by the State in a statute passed March 18, 1867, and it was the way usually adopted by other States when granting similar aid to their own companies.   The wide departure which Arkansas made in this statute from the accustomed form of proceeding, both at home and elsewhere, is strongly indicative of an intention to waive security any further than it was embraced in the reserved power of sequestration.   The constitution of the State gave authority to issue bonds in aid of such works of internal improvement if assented to by the people.   If the people gave their consent, then the bonds when issued became a debt of the State, and there was power in the General Assembly, under the constitution of 1868, to levy taxes for their payment, if necessary.

This disposes of the cases and renders it unnecessary to consider any of the other questions discussed at the bar or in the briefs.   In our opinion the new companies took the roads free of incumbrance in favor of the State, and neither the State nor its bondholders are entitled to a sequestration of the income and revenue arising therefrom in their hands.   The decree of the Circuit Court in each of these cases is consequently

*Affirmed.*

Mr. Justice Blatchford did not sit in these cases or take any part in their decision.