## MERCANTILE TRUST CO. v. BALTIMORE & O. R. CO. et al.

### (Circuit Court, D. Maryland. July 29, 1897.)

1. RAILROADS—RECEIVERS—APPLICATION OF EARNINGS.

A court of equity does not take possession of a railroad for the purpose of performing the contracts of the company, but solely to preserve and protect the property, and to keep the company a going concern, pending the settlement of claims against it; and where the earnings are not sufficient to pay all its creditors after paying operating expenses, and keeping the property in safe condition for operation, they will be applied to the payment of creditors who hold liens or contracts which, if unpaid, they are entitled to enforce, and the enforcement of which will endanger the integrity of the property.

2. SAME—RIGHTS OF PREFERRED STOCKHOLDERS.

Act June 4, 1836 (Laws Md. 1835, c. 395), providing for subscriptions by the state to the stock of various corporations, authorized a subscription of $3,000,000 to the capital stock of the Baltimore & Ohio Railroad Company. Section 9 provided that, before such subscription should be made, the stockholders of the company, in general meeting, should stipulate, agree, and bind the company, by a proper instrument of writing, to guaranty to the state the payment, after three years, "out of the profits of the work," of 6 per centum per annum on the amount subscribed, until such time as the clear annual profits of the road were sufficient to enable it to pay a dividend of 6 per cent. on all its stock, after which the state should be entitled to a perpetual dividend of 6 per cent., and no more. The act also gave the state the right to six directors in the company, on account of such subscription. The instrument was given by the company in the exact language of the act. The charter of the company authorized it to incur indebtedness, and to pledge its property and revenues therefor. *Held* that, the interest and dividends of the state being payable from "profits," it did not become a creditor of the company, but a preferred stockholder, having no equitable lien on the property of the company which entitled the holders of the stock to dividends from the earnings of the road in the hands of receivers in preference to the payment of interest on mortgage indebtedness subsequently contracted.

In the matter of the petition of the Johns Hopkins University in reference to the status of the preferred stock of the Baltimore & Ohio Railroad Company, issued under the Maryland act of 1835 (chapter 395).

James C. Carter, Bernard Carter, Arthur George Brown, and John J. Donaldson, for petitioner, Johns Hopkins University.

E. J. D. Cross, for Baltimore & Ohio R. Co.

Hugh L. Bond, Jr., for receivers of Baltimore & Ohio R. Co.

John G. Johnson, Wm. A. Fisher, Wm. Pinkney Whyte, and C. C. Deming, for trustees of mortgages to secure bondholders.

Before GOFF, Circuit Judge, and MORRIS, District Judge.

PER CURIAM. This court, on February 29, 1896, upon an application contained in a bill filed by a judgment creditor, appointed receivers of the railroads owned, operated, or controlled by the Baltimore & Ohio Railroad Company, and of all its franchises and effects.

The bill alleged, and the fact was, that the railroad company was then largely in arrears for wages, supplies, and operating expenses, and had a large floating debt for money borrowed for a great variety of uses, and was about to make default in the payment of interest on its mortgage bonds and other fixed charges. It had exhausted its means and its credit, and its property was in immediate danger of being seized, and the system of railroads controlled by it liable to be dismembered, and its value dissipated, by attacks from creditors all along its routes. The receivers then appointed took possession, and have since been operating the Baltimore & Ohio System, comprising railroads owned, leased, or controlled by the Baltimore & Ohio Railroad Company in Maryland, Pennsylvania, Delaware, Virginia, West Virginia, Ohio, Indiana, and Illinois, and in the District of Columbia. The property thus came into the custody of this court, and while it so remains, it becomes the duty of the court to direct the disposition of its revenue. It is for the reason that the court must determine how the revenue of this property derived during its temporary custody shall be disposed of, and for this reason alone, that the court has at this time jurisdiction of the controversy now to be considered.

The receivers, upon taking possession, reported to the court the physical condition of the property, and from their report it appeared that the engines and cars were so out of repair and unserviceable that extensive expenditures on the existing equipment, and large additions thereto, were necessary to enable the road to transport its passengers and freight, and to perform its duty to the public under its charter. The large indebtedness due for wages and other operating expenses was of that class to which is given a priority superior to mortgages and other liens, especially when current earnings, which should have been appropriated to the payment of the operating expenses, have been diverted to the payment of mortgage interest. Money to meet this emergency was raised by issuing receivers' certificates, because, as to the wages and supply claims, they had an equity superior to that of the mortgages and other liens, and as to the new equipment, because it was required in order to avoid a great loss to all those who, either as mortgage bondholders, creditors, or stockholders, are interested in the ultimate value of the railroad as a whole, and because without the equipment the railroad could not perform its duty to the public. The receivers' certificates, which for these and similar reasons have been issued, are in the nature of anticipations of revenue, and are primarily to be paid out of the earnings of the railroad which come to the hands of the receivers. The receivers were also, out of the earnings of the road, authorized, to the extent to which the earnings are adequate, to pay the rentals of leased lines, the interest on mortgage bonds, and the installments on car-trust and equipment contracts, so far as may be necessary to prevent defaults and forfeitures which would imperil the integrity of the system of railroads, and the retention of the equipment required for its operation. A court of equity takes temporary possession of a railroad only in order to keep it a going concern, and preserve it pending the efforts of its creditors and stockholders to extricate it from the paraly-

sis of financial embarrassment, or during the litigation which may result from the foreclosure of mortgages. During this period, if the earnings of the property are not sufficient to pay all its creditors, the court directs only those to be paid who, if left unpaid, would have the right to demand that they be allowed to enforce some specific lien, or to assert some title, which would result in surrendering the property, or some necessary part of it, to them. The railroad company has contracted to pay all its creditors, and its obligation as debtor is no greater to pay one than another; but the court, when it takes possession of its property by receivers, does not do so for the purpose of performing the company's contracts, but to protect and preserve the property. Beach, Rec. 331. Therefore, those properties the retention of which impose a burden greater than the present or ultimate benefit to be derived from holding them are discarded, and, if the income is inadequate to pay all, those debts and liabilities are postponed a default in which does not involve the surrender of properties essential to the integrity of the road which the receivers are appointed to preserve.

It is not denied in the present case that the payment of the interest on receivers' certificates, the rentals, the interest on mortgage bonds, and the payment of car-trust and equipment contracts, which the receivers must pay in order to preserve the valuable parts of the Baltimore & Ohio System, together with the current expenses of operating and maintaining the road, exhausts the receipts, and leaves nothing for payment to the holders of the first preferred stock; and it would seem apparent, therefore, that unless the holders of the first preferred stock have a specific lien or security of some kind, which has been imposed upon the property, or some part of it, or upon its revenues, which gives them a right to demand possession of some specific property or fund because of default in the payment of their demand, then it is in the discretion of the court to say that, while the property remains in its custody, it is for the advantage of all concerned that the property shall be preserved, by paying those only who have a lien which clearly gives them such a right.

The petition of the Johns Hopkins University, upon which we are now called to act, filed by it on its own behalf, and on behalf of all other holders of the first preferred 6 per cent. stock of the Baltimore & Ohio Railroad Company, does not deny the inadequacy of the income earned by the receivers to pay the current debts of the class above mentioned, and the inadequacy is admitted by the agreed statement of facts; but the petition claims, and it is admitted, that there would be earnings sufficient to pay the semiannual sums claimed by the first preferred stockholders, if the earnings, after paying operating expenses, were not applied to paying interest on the company's mortgage debts, and the interest on mortgages of connecting lines guarantied by the company, rentals of other lines, and current debts and liabilities; and the prayer of the petition and the relief asked for is that the payments claimed by the first preferred stockholders be declared to be a charge upon the gross profits of the company, to be paid before the interest or principal of any incumbrances or debts later in date than the original subscription of the state of Maryland

to this stock under the act of 1835 (chapter 395), and also be declared to be a first charge or lien, not only on the gross profits of the company, but also a first charge or lien on all the property, real and personal, and the franchises of the company, and on its lateral branches.

It is manifest that the receivers' certificates, issued to pay debts of a preferential character, must be paid, that the expenditures necessary to put and keep the property in a safe condition for operating must be provided for, and that the receivers' operating expenses must also be paid. These expenses must be paid while the court has possession, no matter what liens there are upon the property, or what charges there are upon its income. Next after these come, in the order of their priorities, the claims which have behind them some conveyance or contract which gives them a right of possession or of foreclosure and sale if default is made in payment, and which the court must direct to be paid, in order that it may hold possession without violating clear legal rights.

It is evident, we think, that unless the petitioners, as holders of the stock subscribed for by the state of Maryland, have a lien or charge superior to the liens of the mortgage bondholders, and superior to the rights of the lessors of properties held under leases, and of holders of equipment contracts giving a right of possession upon default, the prayer of the petition cannot be granted. If the petitioners have a right of this paramount nature, it must be because, by the terms of the transaction by which the state of Maryland subscribed to the company's capital stock, the company incurred an obligation which gives to the holders of the stock a perpetual claim upon the income of its property, which cannot be affected by the foreclosure of any of the mortgages executed subsequent to that stock subscription, upon the security of which mortgages there are now outstanding over $40,000,000 of the company's bonds. In fact, as the claim is not for any principal sum of money, but for a perpetual payment of $6 a year for every share of stock, it can never, without the stockholders' consent, be paid off or redeemed, and must remain in the nature of a perpetual rent charge upon the property, and any foreclosure must be made subject to this paramount incumbrance. It will not be denied that such a claim and such rights in a railroad property are exceptional, and at variance with the ordinary rights of a stockholder, and that they cannot be built up on implications and supposed intentions, but must be based upon a contract which fairly requires that interpretation. Tompkins v. Railway Co., 125 U. S. 109, 8 Sup. Ct. 762; Cincinnati v. Morgan, 3 Wall. 275–291.

The act of the general assembly of Maryland of 1835 (chapter 395), passed June 4, 1836, entitled "An act for the promotion of internal improvement," provided for subscription by the state to the capital stock of the Chesapeake & Ohio Canal Company of $3,000,000, and of a like sum to the capital stock of the Baltimore & Ohio Railroad Company; also for a subscription of $1,000,000 to the capital stock of the Eastern Shore Railroad Company, and $500,000 to the capital stock of the Annapolis & Potomac Canal Company, and $500,000 to the capital stock of the Maryland Canal Company. The act was prepared with elaborate care, and no one reading it can doubt that it was drawn

by persons entirely capable of expressing, in apt language, whatever was intended to be incorporated in the law, and who were familiar with the words proper to be put into the law to guard the rights intended to be reserved to the state. The state having already had dealings with the Chesapeake & Ohio Canal Company and the Baltimore & Ohio Railroad Company, the act was carefully framed to provide:

"That the said several subscriptions and payments for the said stock of each of said companies are hereby authorized and directed only upon the condition that none of the rights and remedies of this state under any contract between the state and either of said companies shall be in any wise impaired, waived, relinquished, or affected, by reason of this act, or of anything that may be done by either of said companies in consequence thereof."

With regard to the subscriptions to the stock of the Chesapeake & Ohio Canal Company, it was provided by section 7 that, before the subscription should be made, the company should agree and bind itself, by a proper instrument of writing, to guaranty to the state the payment, out of the profits of the work, 6 per cent. per annum on the money paid by the state to the company, until the clear annual profits of the canal should be more than sufficient to discharge the sums which it should be liable to pay annually to the state, and should be adequate to a dividend of 6 per cent. per annum among its stockholders; and thereafter the state should, in reference to the stock subscribed for, be entitled to a proportional dividend upon the profits of the work, as declared from time to time, and no more.

With respect to the Eastern Shore Railroad Company, the Maryland Canal Company, and the Annapolis & Potomac Canal Company, it was required, as a condition to the state's subscription to the stocks of these companies, that each should covenant, under seal with the state, to pay it, after the expiration of three years from the payment of the subscription, out of the profits of its works, a sum equal to 6 per cent. on the amount subscribed; and that any excess of dividends on the stock of the state above 6 per cent. per annum should be distributed to the other stockholders.

The provision with regard to the subscription to be made to the stock of the Baltimore & Ohio Railroad Company is contained in section 9, and is as follows:

"And be it further enacted, that before any subscription shall be made to the capital stock of the said Baltimore and Ohio Railroad Company under and by virtue of this act, the stockholders of said company shall in general meeting assembled stipulate, agree and bind the said company by a proper instrument of writing, signed by the president, and under the corporate seal thereof, to be lodged with the treasurer of the Western Shore, to guarantee to the state of Maryland, after the expiration of three years from the payment by the state of each of the installments on the stock hereby authorized to be made to the stock of said company, the payment from that time, out of the profits of the work, of six per centum per annum, payable semi-annually on the amount of money which shall be paid to the said company under and by virtue of this act, until the clear annual profits of the said railroad shall be more than sufficient to discharge the interest which it shall be liable so to pay to the state of Maryland, and shall be adequate to a dividend of six per centum per annum among its stockholders; and thereafter the state shall, in reference to the stock so subscribed for, and on so much thereof as the state may hold, be entitled to have and receive a perpetual dividend of six per centum per annum out of the profits of the work as declared from time to time, and no more, and all and so much of such annual

profits as shall exceed six per centum shall be distributed to the other stockholders according to their several interests in the said company; and in consideration of the interest so to be secured to the state, the said Baltimore & Ohio Railroad Company shall be, and they are hereby authorized in addition to the charge now authorized to be made by said company for the transportation of passengers, to increase the price or charge for such transportation to any amount not exceeding one cent per mile for each person passing on said road."

It was thus provided, with respect to the Baltimore & Ohio Railroad Company, that for the first three years after the subscription there should be nothing paid by the company, then that there should be paid out of the profits of the work 6 per cent. per annum on the amounts paid by the state on account of its subscription, payable semiannually, until the profits should be adequate to pay all the stockholders 6 per cent. dividend annually, and thereafter there should be paid to the state a perpetual dividend of 6 per cent. out of the profits, as declared from time to time, and no more; all excess of profits to be distributed to the other stockholders.

It is contended, on behalf of the petitioner, that this language expresses a purpose to pledge or specifically appropriate the profits of the road to the extent, and in such manner, that no money thereafter borrowed, and no obligations thereafter incurred, by the company, and no interest on such borrowed money, and no annual charges resulting from such obligations, could ever have priority of payment over the annual sums or the perpetual dividends payable to the state out of the profits. It is to be observed that there is no pledge or specific appropriation of the profits, except such as results from the language in which the undertaking is expressed. The company executed the guaranty to the state in the exact words of section 9, and there was no mortgage or conveyance of any kind. That it was well understood that there was a difference between such a covenant, guaranty, or undertaking and a specific pledge of revenue is indicated by a clause of section 2 of the act of 1833 (chapter 33), passed February 6, 1834, authorizing a subscription by the state to the separate and distinct stock of the Baltimore & Ohio Railroad Company issued for the construction of the railroad to Washington, which exacts that, before the certificates of indebtedness of the state are delivered in payment for the stock subscribed, the company shall execute an obligation, pledging the property and revenues of the company, for securing to the state the payment of the interest semiannually on the excess by which, at the time of each payment, the installments paid upon the state's subscription exceeded the installments paid upon the subscriptions of the individual subscribers; and in the act of 1833 (chapter 105), passed February 27, 1834, authorizing the payment of the balance of the original subscription of the state to the stock of the company, it was provided that the company should execute an obligation, pledging the property and revenues of the company to pay the interest on the certificates of indebtedness issued by the state for that purpose, to the extent of the excess of the state's payments over the payments of the installments payable by the individual subscribers. And in 1839, it having been found that the 6 per cent. state bonds, originally given to the company in payment of the subscriptions to stock, were not salable upon the terms prescribed, the leg-

islature of Maryland passed an act (Acts 1838, c. 386) April 5, 1839, directing that an equivalent amount of sterling 5 per cent. 50-year bonds of the state be given to the Baltimore & Ohio Railroad Company and the Chesapeake & Ohio Canal Company, in substitution for the original 6 per cent. bonds when surrendered:

"Provided, however, that the said companies, respectively, shall secure by mortgage or other lien on all the property and revenues of said companies, respectively, to the satisfaction of the said treasurer of the Western Shore, the payment of the interest at the rate of five per centum per annum on the stock created by this act semi-annually at least ninety days before the first day of January and July, in every year, for the term of three years from the date of the bonds or certificates of said stock, together with the cost of transmitting said interest to London to be there paid, and also the difference in exchange of currency between London and the city of Baltimore."

And in the act of 1837 (chapter 314), it will be seen that the state attempted to provide for obtaining a priority in the net profits for the payment of its interest or dividends over subsequent loans, but the act was not accepted by the company, and did not become operative.

There are other instances in the Maryland laws, with respect to the corporations created to engage in works of internal improvement, which indicate that, when there was an intention to create a preferred charge upon earnings, or to appropriate revenues for a specific purpose, language definitely expressing that intention was used, and proper legal instruments were directed to be executed, which, in terms, granted or dedicated the revenues for the specific purpose. Several of these acts are cited and commented upon in Macalester's Adm'r v. Maryland, 114 U. S. 598, 5 Sup. Ct. 1065. And noticeably by the act of 1834 (chapter 241), passed March 18, 1835, it was provided that a state loan should be made to the Chesapeake & Ohio Canal Company and to the Baltimore & Susquehanna Railroad Company, with the condition, however, that each of these corporations should pledge to the state the whole of its net revenues and other property, to secure the payment of the interest, and for the final payment of the loan. As the state proposed to raise the money to pay for the stock of the Baltimore & Ohio Railroad Company by issuing its own bonds, nothing would appear to have been simpler, if there had been any intention of creating a lien upon any specific part of the revenue or earnings of the road, than to have exacted either a pledge and appropriation in perpetuity, or, at any rate, until the state's bonds were paid, as was done with respect to the company's property and revenues for the period of three years from the date of the bonds by the act of 1838 (chapter 386).

The fact that a pledge by mortgage was exacted by the state to cover the short periods mentioned in the foregoing acts is fairly indicative, we think, of two conclusions—First, that the state intended, except for the short periods covered by those mortgages, to leave the company's revenue untrammeled by any specific appropriation to itself; and, second, that, as the annual sums guarantied by the company to the state, whether as interest or dividends, were, except during the period covered by the mortgage, payable from first to last only out of profits, no specific pledge, lien, or appropriation was necessary or proper, for the reason that profits are a fund, which, when

ascertained, belong to the stockholders as proprietors, according to the priorities and limitations of their stock. If it had been the intention of the legislature that the position of the state should be that of creditor, or analogous to that of creditor, there would be no reason for restricting its rights to a payment out of profits. A creditor might be restricted to payment out of revenue, or out of net revenue, or out of revenue from which enough has been taken to pay operating expenses, repairs, and fixed charges; but a creditor who is never to be paid the principal of his debt, and is to have only an annual sum, and is restricted, as to that annual sum, to a payment out of profits, is but a preferred stockholder. The state had already, by the act of 1827 (chapter 104), authorized a subscription of 5,000 shares of the capital stock of the company, and the authority given by the act of 1835 (chapter 395) was to "subscribe to the capital stock" $3,-000,000; and section 9 speaks only of a subscription to be made to the capital stock of the said Baltimore & Ohio Railroad Company. By section 6, it was provided that, for each 5,000 shares of stock so subscribed, the state should be entitled to appoint one director, so that the $3,000,000 subscription for 30,000 shares gave to the state 6 additional directors; and it is a fact that the state and the city of Baltimore together for many years, by reason of the directors, which, as stockholders, they were authorized to appoint, had a controlling majority in the board of directors. There is nothing in respect to the 30,000 shares of the capital stock subscribed for by the state which distinguishes those shares from other shares of the company's capital stock, except the provision contained in section 9; and, as we have seen, every provision made by that section for payment in respect to these shares is a payment to be made out of the profits, with no restriction of any kind as to the indebtedness, obligations, or contracts which the company might incur in the effort to make profits. The guaranty of payment exacted by that section is a guaranty limited by the fund from which the payment is to be made, and, therefore, if there are no profits, there are to be no payments. Taft v. Railroad Co., 8 R. I. 310. The state held its 30,000 preferred shares of the capital stock of the company until 1867. Until 1865, the company remitted to London the semiannual interest on the state's sterling bonds, and after that date paid 6 per cent. interest to the state on $3,000,000, in semiannual payments, until 1888, and after that date the company declared semiannual dividends of 3 per cent. on this stock, and paid them to the state, or to its assignees, until the appointment of the receivers. No certificate of any kind for the stock was issued until 1867.

By the constitutions of the state of Maryland of 1864 and 1867, the board of public works was authorized to exchange the interest of the state as stockholder and creditor in the Baltimore & Ohio Railroad Company for an equal amount of bonds or registered debts owing by the state, "to the extent only of all the preferred stock of the state on which the state is entitled to only six per cent. interest," at the market price of the stock, but not less than par. At various times, the state parted with all of its holdings of the preferred stock, except an amount now held for the free school fund, to various corporations and individ-

uals, and among them to the petitioner, for full value. The first certificate was issued in 1867 to an assignee of the state, and thereafter all certificates, including those held by the petitioner, have been in the following form:

"No. ——.                                                            —— Shares.

"Baltimore and Ohio Railroad Company.

"Six Per Cent. Preferred Stock.

"This is to certify, that —————— is entitled to —— shares in the preferred capital stock of the Baltimore and Ohio Railroad Company, the said shares being part of the thirty thousand shares of the said preferred capital stock of the said company, which were subscribed for by the state of Maryland, under the act of December session, 1835, ch. 395, entitled 'An act for the promotion of internal improvement,' and being a part of the preferred capital stock heretofore exchanged by the board of public works of the state of Maryland for the bonds and registered debt of the state, under the provisions of the third section of the twelfth article of the constitution of the said state. The owner of this stock is entitled to a perpetual dividend of six per centum per annum, and no more, upon the said shares, payable out of the gross profits of the said company, under the terms of the original subscription of the said state of Maryland for said stock, and under the guaranty of the said Baltimore and Ohio Railroad Company, made in pursuance of a resolution of the stockholders of the said company, adopted in general meeting on the eighteenth day of July, in the year eighteen hundred and thirty-six. The said dividends are hereafter payable on the first days of January and July in each and every year, and the said stock is transferable on the books of the company, on return of this certificate, with an assignment indorsed thereon.

"Witness the seal of the company, attested by the signature of the treasurer thereof."

The object of the state in granting the charter to the railroad company was to enable it to construct an improved highway to the Ohio river, and it gave to the company all the rights and powers necessary to construct and repair a railroad from Baltimore to the Ohio river, and to make, or cause to be made, lateral railroads; and by the 14th section of the act of 1835 (chapter 395), it was made the duty of the company to establish, at convenient places on its main stem and branches, depots for goods, and to provide suitable carriages in adequate numbers to promptly transport all goods offered at its depots, and it was made liable for damages for failure to do so. By section 13 of the original charter (Act 1826, c. 123), the president and directors were given power to increase the capital stock as many shares, from time to time, as they might deem necessary, and to borrow money, and to issue certificates, or other evidence, therefor, and to pledge the property of the company for the payment of such loans and interest. By the act of 1845 (chapter 313), they were authorized to issue bonds or certificates of indebtedness under seal, and to sell or dispose of them on such terms as to the president and directors might seem proper. With these powers given, and these duties imposed, it was proper for the company to borrow money, if needed, and to give mortgages, if required, and to contract for branch roads, and for suitable equipment; and subsequently, by the act of 1865 (chapter 70), the company was specially empowered to construct and repair the Metropolitan Branch, and to issue bonds, and pledge the property of the company for the payment of the cost of the same. The property has come into the custody of the court with these valid incumbrances charged upon

it, in such manner that a default would threaten the integrity of the road.

The question is not whether, if before the incumbrances were created or the contracts entered into, the company might have been enjoined by the state or the holders of the first preferred stock from endangering the profits out of which was to be paid the 6 per cent. per annum guarantied to the state, but the question is whether, at this time, the court can say there is a profit fund, which these secured lien creditors must not touch, because it is appropriated to the preferred stockholders, and charged with the payment of the 6 per cent. per annum claimed by them. The industry of learned and zealous counsel has not produced an authority in which, from facts or language at all similar, such an appropriation has been declared.

A case relied upon on behalf of the petitioner is Ketchum v. St. Louis, 101 U. S. 306. That was a loan made by the county of St. Louis to the Pacific Railroad Company upon the security of the earnings of the road. Before this transaction the railroad had become bankrupt, and, being largely indebted to the state of Missouri, a law had been passed appointing a fund commissioner, to take complete control of the earnings and income of the property. In this condition of affairs, the county of St. Louis loaned $700,000 to complete the road, under an act of Missouri, which provided that the fund commissioner, or such person as might at any time thereafter have the custody of the funds of the road, should pay to the county of St. Louis $4,000 every month, and $1,000 additional every December, out of the earnings of the railroad, to meet the interest on the loan until the railroad should pay it off. The supreme court said (page 315):

"It was not a simple naked covenant to pay out of a particular fund, but the act, being accepted by the parties interested, operated as an equitable assignment of a fixed portion of that fund,—an assignment which became effectual, without any further intervention upon the part of the debtor, and which the party holding the funds of the company, whether the fund commissioner or some other person, could respect without liability to the debtor for so doing. * * * It was an engagement to pay out of a specially designated fund, accompanied by express authority to its custodian to apply a specific part thereof to a definite object. * * *"

Even to this ruling, based upon facts so pregnant, Mr. Justice Strong and Mr. Justice Bradley dissented, not finding that there was created an equitable lien upon the earnings of the railroad company, or upon its property. In Tompkins v. Railway Co., 125 U. S. 109, 8 Sup. Ct. 762, Ketchum's Case, just cited, was commented upon, and the court said that its facts were peculiar, and that:

"It was a specific appropriation by statute of a fixed and definite portion of the future earnings of the railroad to a particular purpose, with express statutory provision for a custodian of the earnings as they accrued, whose duty it should be to apply this special portion in this specified way. No further action of the company was required. * * * [Page 125, 125 U. S., and page 770, 8 Sup. Ct.] The earnings of the road, to the extent that they had been specifically appropriated to the county of St. Louis, never did belong to the company after the bonds were accepted, and the grant was in equity of such an interest in the road as was necessary to produce the earnings. Hence, a conveyance of the road afterwards to one with notice was necessarily subject to the prior equitable charge on the road, which had been created in favor of the county."

82 F.—24

The case of Tompkins v. Railway Co. arose under a statute of Arkansas directing state bonds to be issued in aid of a railroad, and providing that a tax should be imposed, from time to time, upon the railroad company, equal to the amount of the interest on the bonds, and after five years an additional tax of 2½ per cent., to continue until the bonds were paid by the railroad company, in which case the road should be entitled to a discharge from all claims or liens on the part of the state; and providing that, upon default in payment of this tax, the state, by writ of sequestration, should seize and take possession of the income and revenue, and collect the same until the amount in default was paid. It was claimed that this created an equitable or statutory lien or charge in favor of the state upon the income and revenue of the road, to the extent necessary to meet the interest and principal of the bonds, and that the bondholders could avail themselves of the lien, and enforce it against subsequent incumbrances or purchasers. But, notwithstanding the ruling in Ketchum's Case, it was held by the supreme court that no lien was created upon the property or revenues of the railroad company in favor of the holders of the bonds, and that purchasers under a subsequent mortgage took the property clear. The court said:

"Here there never was any grant of earnings, and, consequently, there never was any grant of an equity in the road."

The court further said:

"We agree with counsel for the appellants that if, on an examination of the statutes, read in the light of the circumstances which surrounded the legislature at the time of their enactment, it appeared to have been the intention to charge the road of the company, as a road, with a liability for the repayment of the loan to be made, it would be the duty of a court of equity to do everything in its power which was necessary to enforce that charge. And it may also be true that the courts ought to construe the statutes liberally, with a view to the establishment of such a charge as against the company itself, or those claiming under it, because, if the charge was actually created by the statutes, those dealing with the company were bound to take notice of it. But, after a careful consideration of the statutes, and construing them liberally in favor of the state, we have been unable to find that any such intention did in fact exist. There was a plain and simple way in which such a lien could be created, and that was by providing in express terms for it."

The foregoing cases were adjudications upon the claims of undisputed creditors. The petitioner's case must be regarded as weaker, in so far as there is a legal inference that the claim of a stockholder, with a voice in the management of the corporation, is subordinate to the debts due to creditors. That this inference is a well-recognized rule of law, and that to rebut it the expression of a contrary intent, in clear and unambiguous language, is required, is shown by the following citations: 2 Beach, Priv. Corp. § 505; Cook, Stock, Stockh. & Corp. Law, § 271; St. John v. Railway Co., 22 Wall. 136–147; Branch v. Jesup, 106 U. S. 468, 1 Sup. Ct. 495; Warren v. King, 108 U. S. 389, 2 Sup. Ct. 789; Railroad Co. v. Nickals, 119 U. S. 296, 7 Sup. Ct. 209; Hamlin v. Railroad Co., 24 C. C. A. 271, 78 Fed. 664; Taft v. Railroad Co., 8 R. I. 310; Chaffee v. Railroad Co., 55 Vt. 110; State v. Cheraw & C. R. Co., 16 S. C. 524; Field v. Lamson & Goodnow Manuf'g Co., 162 Mass. 388, 38 N. E. 1126; Henry v. Railway Co., 3 Jur. (N. S.) pt. 1, p. 1133.

It is urged by the counsel for the petitioner, and with much force, that all the present holders of the first preferred stock have purchased it from the state since the decision of the court of appeals of Maryland in 1848, in the case of State v. Baltimore & O. R. Co., 6 Gill, 363, and that they and all others had a right to rest upon that decision as settling the meaning of section 9 of the act of 1835. That was a case instituted by the state of Maryland, as a holder of the common charter stock of the company. One of the principal points in controversy was whether or not the board of directors could use the profits of the work for reconstructions and improvements, instead of dividing them among the common stockholders. The court decided that, if the directors, in the honest exercise of their duties, deemed it wise to apply the net profits to any of the purposes of the charter, they could do so, and were at liberty to withhold dividends from the common shareholders for that purpose. Answering an argument which had been urged against this view, the court said:

"But it is urged that, if the net profits of the company can be applied to the construction of the road, or to extraordinary works of repair, there would be no profits left to secure the guaranty provided by the 9th section of the act of May session, 1836. But we think the true construction of that section is that this guaranty is to be satisfied out of the gross profits of the company."

The court then proceeds, by an analysis of section 9, to show that the term "profits," as used in the first part of the section, is contradistinguished from the net profits or the "clear annual profits declared from time to time," mentioned later in the section.

If there were now in the hands of the receivers gross profits resulting from the operation of the road, and the question arose as to whether they were to be used to satisfy the petitioner's claim, or were to be used for the reconstruction and extraordinary repairs of the road, the decision in 6 Gill would be in point; but the question whether, by section 9, and the instrument of writing executed thereunder, the gross profits of the work were so granted and charged that no mortgage or other obligation of the company thereafter made could be satisfied from the revenues before gross profits were arrived at, was not decided. The question, so far as it relates to incumbrances now existing, must be determined from the language used, interpreted, where it is ambiguous, by light from the circumstances of the transaction itself; but, in order to affect the rights of third parties, the language so interpreted must be found to have the meaning contended for.

Looking to the fact that the company was charged with duties under its charter which required it to expend large sums of money, and to acquire lateral branches, and that it had given to it the power to borrow money on mortgage of its property, considering that no language customarily used to create a charge upon or a pledge of revenue or income was used, and that the general nature of the state's subscription was that of a stockholder, and not of creditor, it seems to us that it is giving to the decision in 6 Gill a scope which does not rightly belong to it to say that, because of it, no incumbrance since placed upon the property can be allowed to diminish and reduce the gross profits, and that, because of that decision, creditors secured by

mortgage had notice that "the profits of the work" must be taken to be equivalent to gross revenue or gross income. No such question as this was before the court of appeals in 6 Gill, and the language of the court's opinion was not used with reference to any such subject-matter.

The case on behalf of the petitioner and the other holders of the first preferred stock comes to this: that the company having covenanted to pay the state 6 per cent. per annum out of the profits, and having paid it for more than half a century, it has during that time, under powers given it by its charter, borrowed money upon mortgage, and made contracts for lateral branches, the annual payments upon which now consume its earnings, to the extent that there are at this time no profits; and the petitioner contends that those who hold the mortgage bonds and who owned the lateral branches should have taken notice that the preferred stockholders had a claim for 6 per cent. per annum, which was entitled to be satisfied before the claims of such creditors, and the preferred stockholders point to section 9 as establishing their right. We are of opinion that the language of section 9 does not create an equitable assignment, or give an equitable lien, upon any fund which can work such a result. Garrett v. May, 19 Md. 177; Tompkins v. Railway Co., 125 U. S. 109, 8 Sup. Ct. 762; McKittrick v. Railway Co., 152 U. S. 473–496, 14 Sup. Ct. 661; Thomas v. Railway Co., 139 N. Y. 163, 34 N. E. 877; Lehigh Coal & Nav. Co. v. Central R. Co., 34 N. J. Eq. 38; Day v. Railroad Co., 107 N. Y. 129, 13 N. E. 765. From the fact that the payments to the state were only to be made out of the profits, it does not seem at all probable that the framers of the act of 1835 (chapter 395), as they did not restrict the power of the company under its charter thereafter to create mortgages, would have considered it desirable that the company should be required to pay on the state's stock a sum called "profits," which would compel the company to make default upon its mortgage interest, and result in foreclosure. The state's legislation shows a general policy to deal liberally with the Baltimore & Ohio Railroad Company. Maryland v. Railroad Co., 22 Wall. 105–113. Her contracts with the railroads subsequently chartered are much more stringent. See Act 1854, c. 260, exacting a mortgage, with power of sale, upon three months' default, to secure the annuity of $90,000 a year, payable to the state by the Northern Central Railway Company. State v. Northern Cent. Ry. Co., 18 Md. 205.

For the purpose of this decision, we do not feel obliged to consider the question learnedly and ably argued by counsel, as to whether, after the period when the clear annual profits of the company enabled it to pay 6 per cent. per annum dividends to all its stockholders, the state's claim was irrevocably changed from a demand for interest to a right to a preference dividend. It may be argued that, as the company had for some years been paying 6 per cent. dividends to all its stockholders, before issuing any certificate, by the acceptance of a certificate of stock, which declares that the owner is entitled to a perpetual dividend of 6 per cent. per annum upon his shares, the holder is committed to the assertion by the company that the dividend-paying period had been reached, and that the interest-paying period had

passed, and is restricted to the provisions of section 9, applicable to the dividend-paying period; but we place our decision, not upon this, but upon the fact that both interest and dividends were payable out of profits, without any specific lien or equitable charge.

We think the order asked for must be denied, and the petition dismissed.