APPEAL OF LEAH BRUNT, ADMINISTRATRIX, ESTATE OF THEODORE S. BRUNT.

Docket No. 2869.     Decided October 21, 1926.

1. In view of the political nature of the power of Congress, the absence of any reference to Federal tax in respect of mineral rights in the Allotment Act of 1906, and the express and inclusive terms of the Revenue Act of 1918, *held*, that a member of the Osage Indian tribe is subject to income tax on royalties and proceeds from mineral rights of the tribe.

2. As Congress has plenary power over Indian affairs, the question whether Indians shall or shall not be taxed is a matter of legislative discretion, and when clearly exercised by statute may not be limited by construction.

3. The general rule of treating the Indians fairly and construing general legislation liberally in their favor does not require the construction of the plain language of the statute so as to exempt the Indians from tax. This is especially so in view of *The Cherokee Tobacco*, 11 Wall. 616, where the court upheld a Federal tax upon Indians.

4. The limitation upon the power of the States to tax the Indian or otherwise interfere with the constitutional power of Congress over Indian affairs is no measure of the power of Congress and no criterion of its exercise.

*T. J. Leahy, Esq.*, for the petitioner.
*Ellis W. Manning, Esq.*, for the Commissioner.

The question is whether income received by a member of the Osage tribe of Indians, derived from the oil and gas rights of the tribe, is taxable. It is stipulated that if the income in question is held to be taxable there is for 1919 an overpayment of $43.37 and for 1920 a deficiency of $150.39.

FINDINGS OF FACT.

Leah Brunt is the administratrix of the estate of Theodore S. Brunt, who during his lifetime was an enrolled member of the Osage tribe of Indians and sustained tribal relations with said tribe in Oklahoma. During 1920 there was distributed to him $5,000 as his pro rata share of the proceeds from the sale of oil leases by the

Osage tribe of Indians, and $4,900 as his pro rata share of royalties from oil and gas leases theretofore made by said tribe under regulations approved by the Secretary of the Interior. These amounts were paid to the decedent through the Osage Indian Agency at Pawhuska, Okla.

### OPINION.

STERNHAGEN: The question presented affects all restricted Indians of the Osage tribe. It applies particularly to the years 1919 and 1920, and therefore its decision is not affected by the fact that citizenship has since been conferred upon the Osages. The facts are stipulated by the parties but they do not disclose the exact status of the decedent, except his enrollment as a member of the Osage tribe. Whether he was certified as competent by the Secretary of the Interior under the Allotment Act of 1906, does not appear, but from the briefs we assume that no such certificate had been issued. If this assumption is erroneous our decision is nevertheless the same, as will appear.

The theory upon which the Commissioner asserts the tax in question is in short compass, being simply that since by the Revenue Act of 1918, sections 210 and 211, a tax is imposed " upon the net income of every individual," there being no exception expressly applicable either to the Indian as a subject of the tax or to the income in question as an item of gross income " from whatever source derived," the tax here is expressly imposed. The petitoner argues that the Osage tribe is a political entity not within the taxable class enumerated in the statute; that its property is held in trust by the Government for the tribe, the income not being subject to tax against the tribe or upon distribution against the members of the tribe, and that the Sixteenth Amendment does not authorize the tax. Bringing these two opposing arguments together, it will be seen that they require an exhaustive examination into the nature and scope of the relation between the United States and the Indian, with full regard for the history of that relation, in order that the decision reached may not bring about an inconsistency between the policy of Congress in Indian affairs and its policy in tax legislation. This is not to say that our decision may be founded upon our conception of legislative policy rather than upon the clear intendment of the taxing statute, but only that, when we are called upon to construe the Revenue Act we may not so far disregard other existing legislation as to bring about a conflict so that a clearly evinced purpose of Congress may be obstructed. See *New York, Ontario & Western Ry. Co.*, 1 B. T. A. 1172.

The history of Indian affairs need not be elaborately dealt with here.[1] The Supreme Court outlined it generally in *Matter of Heff*, 197 U. S. 488, as follows:

In the early dealings of the Government with the Indian tribes the latter were recognized as possessing some of the attributes of nations, with which the former made treaties, and the policy of the Government was, sometimes by treaties and sometimes by the use of force, to put a stop to the wanderings of these tribes and locate them on some definite territory or reservation, there establishing for them a communal or tribal life. While this policy was in force, and this location of wandering tribes was being accomplished, much of the legislation of Congress ran in the direction of the isolation of the Indians, preventing general intercourse between them and their white neighbors in order that they might not be defrauded or wronged through the superior cunning and skill of those neighbors. The practice of dealing with the Indian tribes as separate nations was changed by a proviso inserted in the Indian appropriation act of March 3, 1871 (16 Stat. 566; carried into section 2079 Rev. Stat.), which reads: "No Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty." From that time on the Indian tribes and the individual members thereof have been subjected to the direct legislation of Congress which, for some time thereafter, continued the policy of locating the tribes on separate reservations and perpetuating the communal or tribal life.

\*        \*        \*        \*        \*        \*        \*

Of late years a new policy has found expression in the legislation of Congress—a policy which looks to the breaking up of tribal relations, the establishing of the separate Indians in individual homes, free from national guardianship and charged with all the rights and obligations of citizens of the United States.

This decision was overruled in *United States* v. *Nice*, 241 U. S. 591, in which the power of Congress to regulate the sale of liquor to Indian allottees was upheld.

As to the status of the Indian and the tribe, see *Elk* v. *Wilkins* (1884), 112 U. S. 94, in which it is said:

The Indian tribes, being within the territorial limits of the United States, were not, strictly speaking, foreign States; but they were alien nations, distinct political communities, with whom the United States might and habitually did deal, as they thought fit, either through treaties made by the President and Senate, or through acts of Congress in the ordinary forms of legislation. The members of those tribes owed immediate allegiance to their several tribes, and were not part of the people of the United States. They were in a dependent condition, a state of pupilage, resembling that of a ward to his guardian.

The court said in *United States* v. *Kagama* (1886), 118 U. S. 375:

They were, and always have been, regarded as having a semi-independent position when they preserved their tribal relations; not as States, not as

---

[1] See Eighteenth Annual Report, Bur. Am. Ethnology, G. P. O. 1899, p. 640, *et seq.*; The Indian in Relation to the White Population of the United States, by Fayette Avery McKenzie (1908), Lib. Cong., Class E 77, Book M 15; The American Indian and Government Indian Administration, by Edgar B. Merritt, Asst. Indian Commissioner, Office of Indian Affairs, Bulletin 12 (reprint, 1926).

nations, not as possessed of the full attributes of sovereignty, but as a separate people, with the power of regulating their internal and social relations, and thus far not brought under the laws of the Union or of the State within whose limits they resided.

And in *Choate* v. *Trapp* (1912), 224 U. S. 665:

The Tribes have been regarded as dependent nations, and treaties with them have been looked upon not. as contracts, but as public laws which could be abrogated at the will of the United States.

See also *Roff* v. *Burney*, 168 U. S. 218.

Prior to allotment the Indians' title to land in the reservations was restricted to that of occupancy alone, the United States retaining the fee. *Jones* v. *Meehan*, 175 U. S. 1. See also *Cherokee Nation* v. *Hitchcock*, 187 U. S. 294. The right in the timber was not complete, as it did not include the right to cut for commercial sale. *United States* v. *Cook*, 19 Wall. 591; *Beecher* v. *Wetherby*, 95 U. S. 517. After allotment with an express provision for tax exemption of the land, the right to the exemption from state tax was as good as the title to the allotted land itself. *Choate* v. *Trapp*, 224 U. S. 665, so held, and the court said:

The patent and the legislation of Congress must be construed together, and when so construed they show that Congress, in consideration of the Indians' relinquishment of all claim to the common property, and for other satisfactory reasons, made a grant of land which should be non-taxable for a limited period. The patent issued in pursuance of those statutes gave the Indian as good a title to the exemption as it did to the land itself. Under the provisions of the Fifth Amendment there was no more power to deprive him of the exemption than of any other right in the property. No statute would have been valid which reduced his fee to a life estate, or attempted to take from him ten acres, or fifty acres, or the timber growing on the land. After he accepted the patent the Indian could not be heard, either at law or in equity, to assert any claim to the common property. If he is bound, so is the tribe and the Government when the patent was issued.

\*       \*       \*       \*       \*       \*       \*

The provision that "all land shall be non-taxable" naturally indicates that the exemption is attached to the land—only an artificial rule can make it a personal privilege. But if there is any conflict between the natural meaning and the technical construction,—if there were room for doubt, or if there were any question as to whether this was a personal privilege and repealable, or an incident attached to the land itself for a limited period, that doubt, under this rule, must be resolved in favor of the patentee.

\*       \*       \*       \*       \*       \*       \*

There have been comparatively few cases which discuss the legislative power over private property held by the Indians. But those few all recognize that he is not excepted from the protection guaranteed by the Constitution. His private rights are secured and enforced to the same extent and in the same way as other residents or citizens of the United States. *In re Heff*, 197 U. S. 488, 504; *Cherokee Nation* v. *Hitchcock*, 187 U. S. 294, 307; *Smith* v. *Goodell*,

20 Johns. (N. Y.) 188; *Lowry* v. *Weaver*, 4 McLean, 82; *Whirlwind* v. *Von der Ahe*, 67 Mo. App. 628; *Taylor* v. *Drew*, 21 Arkansas, 485, 487. His right of private property is not subject to impairment by legislative action, even while he is, as a member of a tribe and subject to the guardianship of the United States as to his political and personal status.

The Indian was a person irrespective of citizenship. *United States ex rel. Standing Bear* v. *Crook*, 5 Dill. 453; 25 Fed. Cas. 695, Case No. 14,891. Birth within the territorial limits of the United States was not alone sufficient to confer citizenship, even under the Fourteenth Amendment, and even although the Indian was separated from his tribe. *Elk* v. *Wilkins*, 112 U. S. 94. On the other hand, a United States citizen did not lose his citizenship because he became by adoption a member of an Indian tribe. *Roff* v. *Burney*, 168 U. S. 218. His responsibility under the criminal law was not less by reason of the restriction upon his power of alienation of his allotted land. *Matter of Heff*, 197 U. S. 488. The restriction of the power of alienation is not inconsistent with citizenship, *Tiger* v. *Western Investment Co.*, 221 U. S. 286; and citizenship is not in itself an obstacle to the exercise by Congress of its power to enact laws for the benefit and protection of tribal Indians as a dependent people. *Cherokee Nation* v. *Hitchcock*, 187 U. S. 294; *United States* v. *Sandoval*, 231 U. S. 28.

The history of the Osage reservation is outlined in *Thomas* v. *Gay*, 169 U. S. 264, as follows:

It is, indeed, true that the lands in question, constituting the reservations of the Osage and Kansas Indians, are portions of lands previously granted by patent of the United States, in pursuance of the treaty of May 6, 1828, 7 Stat. 311, and of the treaty of December 29, 1835, 7 Stat. 478, to the Cherokee Nation of Indians, and that it was provided, in those treaties, that the lands so granted should not, without the consent of the Indians, at any future time be " included within the territorial limits or jurisdiction of any State or Territory."

In the subsequent treaty with the Cherokees of July 19, 1866, 14 Stat. 799, 804, it was stipulated that the United States might " settle friendly Indians in any part of the Cherokee country west of the 96th degree, to be taken in a compact form, in quantity not exceeding 160 acres for each member of each of said tribes thus to be settled, the boundaries of each of said districts to be distinctly marked, and the land conveyed in fee simple to each of said tribes, * * * said land to be paid for to the Cherokee Nation, at such price as may be agreed upon between the said parties in interest, subject to the approval of the President."

On the 26th of June, 1866, a treaty was made with the Osage Indians, 14 Stat. 687, wherein it was provided that a large part of the reservation then occupied by that tribe in Kansas was sold outright to the Government for a certain sum of money, and by article 16 of said treaty it was provided that " If said Indians should agree to remove from the State of Kansas and settle on land to be provided for them by the United States in the Indian Territory, on such terms as may be agreed upon between the United States and the Indian

tribes now residing in said Territory, or any of them, then the diminished reservation shall be disposed of by the United States in the same manner and for the same purposes as hereinbefore provided in relation to said trust lands, except that fifty per cent of the proceeds of the sale of said diminished reserve may be used by the United States in the purchase of lands for a suitable home for said Indians in said Indian Territory."

On July 15, 1870, 16 Stat. 335, Congress passed an act, providing, in substance that whenever the Osages should agree thereto, in such manner as the President should prescribe, said Indians should be removed from their said diminished reservation in the State of Kansas to the lands to be provided for them in the Indian Territory, " to consist of a tract of land in compact form, equal in quantity to 160 acres for each member of the tribe, to be paid for out of the proceeds of the sales of their lands in the State of Kansas;" and subsequently the Osages were established upon their present reservation, and the Cherokees were paid therefor the sum of $1,650,600; and by an act approved June 5, 1872, 17 Stat. 228, Congress confirmed this reservation in said Cherokee country.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

In 1883, sufficient money having been realized from the sales to pay for said lands, a deed was duly executed by the Cherokees conveying all their rights and title in and to the United States for the use of the said Osage and Kansas Indians, which deed is recorded in volume 6 of the Indian Deeds in the office of the Commissioner of Indian Affairs in the Department of the Interior.

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

* * * The United States have, by the act of May 2, 1890, 26 Stat. 81, creating the Territory of Oklahoma, included these Osage and Kansas Indian lands within the geographical limits of said Territory.

It is well settled that Congress has plenary power over Indian affairs derived from the constitutional authority to regulate commerce with the Indian tribes. Const., Art. I, section 8, cl. 3.

The power of the General Government over these remnants of a race once powerful, now weak and diminished in numbers, is necessary to their protection, as well as to the safety of those among whom they dwell. It must exist in that government because it never has existed anywhere else, because the theatre of its exercise is within the geographical limits of the United States, because it has never been denied, and because it alone can enforce its laws on all the tribes. (*United States* v. *Kagama*, 118 U. S. 375.)

The unlimited power of Congress to deal with the Indians, their property and commercial transactions, so long as they keep up their tribal organizations, may be conceded; * * * (*Thomas* v. *Guy*, 169 U. S. 264.)

Congress may restrict the Indians' use of the land by prohibiting the cutting and selling of all but dead and down timber and directing to some extent the use of the proceeds. *Pine River Logging Co.* v. *United States*, 186 U. S. 279.

In *Lone Wolf* v. *Hitchcock*, 187 U. S. 553, the court said:

Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one, not subject to be controlled by the judicial department of the

57694°—27——13

government. Until the year 1871 the policy was pursued of dealing with the Indian tribes by means of treaties, and, of course, a moral obligation rested upon Congress to act in good faith in performing the stipulations entered into on its behalf. But, as with treaties made with foreign nations, *Chinese Exclusion Case*, 130 U. S. 581, 600, the legislative power might pass laws in conflict with treaties made with the Indians. *Thomas* v. *Gay*, 169 U. S. 264, 270; *Ward* v. *Race Horse*, 163 U. S. 504, 511; *Spalding* v. *Chandler*, 160 U. S. 394, 405; *Missouri, Kansas & Texas Ry. Co.* v. *Roberts*, 152 U. S. 114, 117; *The Cherokee Tobacco*, 11 Wall. 616.

The power exists to abrogate the provisions of an Indian treaty, though presumably such power will be exercised only when circumstances arise which will not only justify the government in disregarding the stipulations of the treaty, but may demand, in the interest of the country and the Indians themselves, that it should do so. When, therefore, treaties were entered into between the United States and a tribe of Indians it was never doubted that the *power* to abrogate existed in Congress, and that in a contingency such power might be availed of from considerations of governmental policy, particularly if consistent with perfect good faith towards the Indians. * * *

* * * We must presume that Congress acted in perfect good faith in the dealings with the Indians of which complaint is made, and that the legislative branch of the government exercised its best judgment in the premises. In any event, as Congress possessed full power in the matter, the judiciary cannot question or inquire into the motives which prompted the enactment of this legislation. If injury was occasioned, which we do not wish to be understood as implying, by the use made by Congress of its power, relief must be sought by an appeal to that body for redress and not to the courts. * * *

See also *Gritts* v. *Fisher* (1912), 224 U. S. 640.

It is thoroughly established that Congress has plenary authority over the Indians and all their tribal relations, and full power to legislate concerning their tribal property. The guardianship arises from their condition of tutelage or dependency; and it rests with Congress to determine when the relationship shall cease; the mere grant of rights of citizenship not being sufficient to terminate it. * * * (*Winton* v. *Amos*, 255 U. S. 373, 391.)

In the exercise of this plenary power Congress alone is the judge of the wisdom and expediency of legislation. The policy to be pursued is not a judicial question, and just as Congress has changed or modified the Indian policy in the past, so it may in the future; and manifestly it is to be left free to do so. Benefits to be bestowed or restrictions or hardships to be imposed upon the Indians are matters of legislative concern, and when the language used is clear it is final. This exercise of authority has taken many forms and has been considered in many cases before the Supreme Court and has always been upheld irrespective of its particular effect.

It is to be presumed that in this matter the United States would be governed by such considerations of justice as would control a Christian people in their treatment of an ignorant and dependent race. Be that as it may, the propriety or justice of their action towards the Indians with respect to their lands is a question of governmental policy, * * *. (*Beecher* v. *Wetherby*, 95 U. S. 517.)

But if the words used in the treaty of 1866, reasonably interpreted, import beyond question an absolute, unconditional cession of the lands in question to the United States free from any trust, then the court cannot amend the treaty or refuse to carry out the intent of the parties, as gathered from the words used, merely because one party to it held the relation of an inferior and was politically dependent upon the other, or because in the judgment of the court the Indians may have been overreached. To hold otherwise would be practically to recognize an authority in the courts not only to reform or correct treaties, but to determine questions of mere policy in the treatment of the Indians which it is the function alone of the legislative branch of the Government to determine.

It is said in the present case that the interpretation of the treaty in accordance with the views of the United States would put the Government in the attitude of having acquired lands from the Indians at a price far below their real value. Even if this were true it would not authorize the court in determining the legal rights of the parties to proceed otherwise than according to the established principles of interpretation, and out of a supposed wrong to one party evolve a construction not consistent with the clear import of the words of the treaty. If the treaty of 1866, according to its tenor and obvious import, did injustice to the Choctaws and Chickasaws, the remedy is with the political department of the Government. As there is no ground to contend in this case that that treaty, if interpreted according to the views of the Government, was one beyond the power of the parties to make, it is clear that even if the United States did not deal generously with the Choctaws and Chickasaws in respect of the lands in dispute—and we do not mean to say that there is any ground whatever for so contending—the wrong done must be repaired by Congress, and cannot be remedied by the courts without usurping authority that does not belong to them. (*United States* v. *Choctaw &c. Nations*, 179 U. S. 494.)

It is said that the State has conferred upon these Indians the right of suffrage and other rights that ordinarily belong only to citizens, and that they ought, therefore to share the burdens of government like other people who enjoy such rights. These are considerations to be addressed to Congress. It is for the legislative branch of the Government to say when these Indians shall cease to be dependent and assume the responsibilities attaching to citizenship. That is a political question, which the courts may not determine. We can only deal with the case as it exists under the legislation of Congress. (*United States* v. *Rickert*, 188 U. S. 432.)

Of the power of the Government to carry out this policy there can be no doubt. It is under no constitutional obligation to perpetually continue the relationship of guardian and ward. It may at any time abandon its guardianship and leave the ward to assume and be subject to all the privileges and burdens of one *sui juris*. And it is for Congress to determine when and how that relationship of guardianship shall be abandoned. It is not within the power of the courts to overrule the judgment of Congress. It is true there may be a presumption that no radical departure is intended, and courts may wisely insist that the purpose of Congress be made clear by its legislation, but when that purpose is made clear the question is at an end. (*Matter of Heff*, 197 U. S. 488.)

Taking these decisions together, it may be taken as the settled doctrine of this court that Congress, in pursuance of the long-established policy of the Government, has a right to determine for itself when the guardianship which

has been maintained over the Indian shall cease. It is for that body, and not for the courts, to determine when the true interests of the Indian require his release from such condition of tutelage. (*Tiger* v. *Western Investment Co.*, 221 U. S. 286, 315, followed in *United States* v. *Sandoval*, 231 U. S. 28.)

In the more recent case of *United States* v. *First National Bank*, 234 U. S. 245, the court held that a statute which clearly emancipated all mixed-blood Indians from a restriction upon their right to convey land could not be construed to apply only to Indians of more than half white blood because of an alleged hardship upon Indians of less than half white blood.

If the effect of the legislation has been disastrous to the Indians, that fact will not justify the courts in departing from the terms of the act as written. If the true construction has been followed with harsh consequences, it cannot influence the courts in administering the law. The responsibility for the justice or wisdom of legislation rests with the Congress, and it is the province of the courts to enforce, not to make, the laws. *St. Louis, Iron Mt. & S. Ry. Co.* v. *Taylor*, 210 U. S. 281, 294; *Texas Cement Co.* v. *McCord*, 233 U. S. 157, 163.

\*    °    \*    ■    \*    \*    \*

\* \* \* The conviction is very strong that if Congress intended to remove restrictions only from those who had half white blood or more, it would have inserted in the act the words necessary to make that intention clear, that is, we deem this a case for the application of the often expressed consideration, aiding interpretation, that if a given construction was intended it would have been easy for the legislative body to have expressed it in apt terms. *Farrington* v. *Tennessee*, 95 U. S. 679, 689; *Bank* v. *Matthews*, 98 U. S. 621, 627; *Tompkins* v. *Little Rock & Ft. S. R. Co.*, 125 U. S. 109, 127; *United States* v. *Lexington Mill Co.*, 232 U. S. 399, 410.

Congress was very familiar with the situation, the subject having been before it in many debates and discussions concerning Indian affairs. This was a reservation inhabited by Indians of full blood and others of all degrees of mixed blood, some with a preponderance of white blood, others with less and many with very little. If Congress, having competency in mind and that alone, had intended to emancipate from the prevailing restriction on alienation only those who were half white or more, by a few simple words it could have effected that purpose. We cannot believe that such was the congressional intent, and we are clearly of opinion that the courts may not supply the words which Congress omitted. Nor can such course be induced by any consideration of public-policy or the desire to promote justice, if such would be its effect, in dealing with dependent people.

See *La Motte* v. *United States*, 254 U. S. 570.

The Osage Allotment Act of June 28, 1906, 34 Stat. 539, provides for the allotment of all the Osage lands. It provides, in section 1, the Indians who may be considered as properly enrolled and therefore entitled under the Act. Section 2 provides " that all lands belonging to the Osage tribe of Indians in Oklahoma Territory, except as herein provided, shall be divided among the members of said tribe, giving to each his or her fair share thereof in acres, as follows." It is then provided in detail that each Indian may make his first selection of

160 acres and the method and manner of selection. He may then make in the same manner a second and third selection. The remaining lands are then to be divided equally among the members of the tribe.

Seventh. That the Secretary of the Interior, in his discretion, at the request and upon the petition of any adult member of the tribe, may issue to such member a certificate of competency, authorizing him to sell and convey any of the lands deeded him by reason of this Act, except his homestead, which shall remain inalienable and nontaxable for a period of twenty-five years, or during the life of the homestead allottee, if upon investigation, consideration, and examination of the request he shall find any such member fully competent and capable of transacting his or her own business and caring for his or her own individual affairs: *Provided*, That upon the issuance of such certificate of competency the lands of such member (except his or her homestead) shall become subject to taxation, and such member, except as herein provided, shall have the right to manage, control, and dispose of his or her lands the same as any citizen of the United States: *Provided*, That the surplus lands shall be nontaxable for the period of three years from the approval of this Act, except where certificates of competency are issued or in case of the death of the allottee, unless otherwise provided by Congress: *And provided further*, That nothing herein shall authorize the sale of the oil, gas, coal, or other minerals covered by said lands, said minerals being reserved to the use of the tribe for a period of twenty-five years, and the royalty to be paid to said tribe as hereinafter provided: *And provided further*, That the oil, gas, coal, and other minerals upon said allotted lands shall become the property of the individual owner of said land at the expiration of said twenty-five years, unless otherwise provided for by Act of Congress.

Sec. 3. That the oil, gas, coal, or other minerals covered by the lands for the selection and division of which provision is herein made are hereby reserved to the Osage tribe for a period of twenty-five years from and after the eighth day of April, nineteen hundred and six; and leases for all oil, gas, and other minerals, covered by selections and division of land herein provided for, may be made by the Osage tribe of Indians through its tribal council, and with the approval of the Secretary of the Interior, and under such rules and regulations as he may prescribe: *Provided*, That the royalties to be paid to the Osage tribe under any mineral lease so made shall be detemined by the President of the United States: *And provided further*, That no mining of or prospecting for any of said mineral or minerals shall be permitted on the homestead selections herein provided for without the written consent of the Secretary of the Interior: *Provided, however*, That nothing herein contained shall be construed as affecting any valid existing lease or contract.

Section 4 provides that all funds belonging to the tribe shall be held in trust by the United States for 25 years, except that certain funds are to be credited to the individual Indians at once on a pro rata division and the interest paid to the individuals quarterly.

Second. That the royalty received from oil, gas, coal, and other mineral leases upon the lands for which selection and division are herein provided, and all moneys received from the sale of town lots, together with the buildings thereon, and all moneys received from the sale of the three reservations of one hundred and sixty acres each heretofore reserved for dwelling purposes, and all moneys received from grazing lands, shall be placed in the Treasury of

the United States to the credit of the members of the Osage tribe of Indians as other moneys of said tribe are to be deposited under the provisions of this Act, and the same shall be distributed to the individual members of said Osage tribe according to the roll provided for herein, in the manner and at the same time that payments are made of interest on other moneys held in trust for the Osages by the United States, except as herein provided.

Sec. 5. That at the expiration of the period of twenty-five years from and after the first day of January, nineteen hundred and seven, the lands, mineral interests, and moneys, herein provided for and held in trust by the United States shall be the absolute property of the individual members of the Osage tribe, according to the roll herein provided for, or their heirs, as herein provided, and deeds to said lands shall be issued to said members, or to their heirs, as herein provided, and said moneys shall be distributed to said members, or to their heirs, as herein provided, and said members shall have full control of said lands, moneys, and mineral interests, except as hereinbefore provided.

Sec. 7. That the lands herein provided for are set aside for the sole use and benefit of the individual members of the tribe entitled thereto, or to their heirs, as herein provided; and said members, or their heirs, shall have the right to use and to lease said lands for farming, grazing, or any other purpose not otherwise specifically provided for herein, and said members shall have full control of the same, including the proceeds thereof: *Provided,* That parents of minor members of the tribe shall have the control and use of said minors' lands, together with the proceeds of the same, until said minors arrive at their majority: *And provided further,* That all leases given on said lands for the benefit of the individual members of the tribe entitled thereto, or for their heirs, shall be subject only to the approval of the Secretary of the Interior.

The provisions especially germane to the present decision are that the mineral rights were treated as separate from the land, for they are referred to as " covered by said land," and were reserved from allotment irrespective of whether they were beneath the homestead or the surplus lands; the homestead lands were nontaxable for 25 years and the surplus lands for three years; the mineral rights under all lands were inalienable for 25 years, after which they go to the allottee; mineral leases may be made with the approval of the Secretary of the Interior at royalties determined by the President; the royalties and proceeds from sale are to be distributed quarterly to the individual members of the tribe. Nothing is said as to tax in respect of mineral rights or royalties therefrom.

This Act of 1906 was effective during the taxable years here in question, and it is of no direct concern that section 3 was substantially amended by the Act of March 3, 1921, 41 Stat. 1249, in which all members of the Osage tribe were declared to be citizens. The difference between surface rights and mineral rights is still recognized, and a gross production tax by the State is expressly authorized.

Reasoning directly from these outstanding premises, namely, the power of Congress and its unfettered political nature, the Allotment Act and its freedom from any reference to income or other tax in respect of mineral rights, and the Revenue Act of 1918 and its unambiguous levy upon the net income of all individuals with no

exception of or exemption to Indians, the conclusion is mandatory that the Commissioner correctly imposed the tax, unless there be other considerations so overwhelming as to outweigh the force of those just mentioned.

The point is raised that it is a recognized doctrine of the courts in adjudicating questions relating to Indians that their place in our national affairs is so different from that of other persons within our borders that they are *sui generis*, and hence that no general legislation will apply to them, special legislation being always necessary to reach them. The argument seems to be narrowed to the view that the policy of the nation toward this weaker people requires special legislation to impose burdens upon them. See 34 Ops. Atty. Gen. 275 (March 15, 1924); 34 Ops. Atty. Gen. 439 (March 20, 1925); *Colonial Trust Co.* v. *Lewellyn*, 12 Fed. (2d) 481.

It has been said that statutes and treaties when open to construction are to be construed liberally for the Indians. *Elk* v. *Wilkins*, 112 U. S. 94. But a full examination of the cases in which such expressions are used discloses only that the general purpose of Congress to treat the Indians fairly has been given heed in construing a particular instrument. This does not mean that the individual Indian or the particular tribe is always, in litigation with the Government or another, to be favored according to his own notion of fairness. And surely it does not go so far as to imply that the plain meaning of words in a general Federal statute is to be restrictively interpreted when in another case there would be no room for construction. *United States* v. *Choctaw &c. Nations*, 179 U. S. 494. Furthermore, there is the stronger rule already adverted to that Congress is the sole judge of the wisdom of legislation and Indian policy. It is quite conceivable that Congress deliberately taxed the Indian because it believed this to be a salutary measure and that it would accelerate his progress toward taking his proper place in our national life. This is not a far cry from the change from a policy of segregation to one of amalgamation, or from a policy of having the Secretary of the Interior certify competency to one of the complete bestowal of citizenship.

However may be the interpretation of treaties and other statutes, we are bound as to the applicability of Federal tax statutes by an authoritative decision of the Supreme Court. *The Cherokee Tobacco*, 11 Wall. 616, involved, "first, the question of the intention of Congress, and, second, assuming the intention to exist, the question of its power, to tax certain tobacco in the territory of the Cherokee nation, in the face of a prior treaty between that nation and the United States, that such tobacco should be exempt from taxation."

The Act of July 20, 1868, 15 Stat. 167, imposed taxes on the manufacture and sale of distilled spirits, fermented liquors, tobacco, snuff and cigars, and made no exemption as to Indians or Indian territory.

The word " person " was defined in section 104 to include all natural persons, and firms, partnerships, associations, companies and corporations, and by section 107 the Act was to extend to production anywhere within the United States, whether within a collection district or not.   Two Cherokee Indians defended their property against a forfeiture for failure to pay the tobacco tax, on the ground that the tax did not apply within the Cherokee reservation.   The court, in sustaining the forfeiture and holding the tax valid and applicable, said :

The language of the section is as clear and explicit as could be employed. It embraces indisputably the Indian territories.   Congress not having thought proper to exclude them, it is not for this court to make the exception.   If the exemption had been intended it would doubtless have been expressed.   There being no ambiguity, there is no room for construction.   It would be out of place.   The section must be held to mean what the language imports.   When a statute is clear and imperative, reasoning *ab inconvenienti* is of no avail. It is the duty of courts to execute it.

Furthermore, the court recognized a clear repugnancy between the statute and the earlier Cherokee treaty and held that the statute superseded the treaty.

Treaties with Indian nations within the jurisdiction of the United States, whatever considerations of humanity and good faith may be involved and require their faithful observance, cannot be more obligatory [than treaties with foreign nations].   They have no higher sanctity; and no greater inviolability or immunity from legislative invasion can be claimed for them.   The consequences in all such cases give rise to questions which must be met by the political department of the government.   They are beyond the sphere of judicial cognizance.   In the case under consideration the act of Congress must prevail as if the treaty were not an element to be considered.   If a wrong has been done the power of redress is with Congress, not with the judiciary, and that body, upon being applied to, it is to be presumed, will promptly give the proper relief.

Does the section thus construed deserve the severe strictures which have been applied to it?   As before remarked, it extends the revenue laws over the Indian territories only as to liquors and tobacco.   In all other respects the Indians in those territories are exempt.   As regards those articles only the same duties are exacted as from our own citizens.   The burden must rest somewhere.   Revenue is indispensable to meet the public necessities.   Is it unreasonable that this small portion of it shall rest upon these Indians?   The frauds that might otherwise be perpetrated there by others, under the guise of Indian names and simulated Indian ownership, is also a consideration not to be overlooked.

By way of adding significance to the prevailing opinion, it is noted that the dissenting opinion of Justices Bradley and Davis is based substantially upon the view that the tax statute, being general, should not impair the treaty.   This decision of the court was delivered in December, 1870.   Fourteen years later, on September 29, 1884, the Attorney General advised that the decision still required

the collection of internal taxes in Indian Territory. 18 Ops. Atty. Gen. 66.

Of the many cases in which the Indian has been considered, this is the only decision of the Supreme Court involving his tax liability to the Federal Government. This unqualifiedly sustained the liability. We see no distinction, such as is sought to be drawn, between that case, because it in some measure referred to a territorial exemption, and this, because it involves a personal or tribal status. There, as here, the basis of the contention was the freedom of the Indian from tax, and the court held a general statute to be effective to tax him. The similarity of the argument seems to us to be clear and the decision therefore controlling.

There have been several occasions when the validity of legislation by the States in respect of the Indians has been considered by the court, and these cases are invoked as indicating the persistent plan of exempting the Indian from tax. See 34 Ops. Atty. Gen. 275 (March 15, 1924) ; 34 Ops. Atty. Gen. 439 (March 30, 1925) ; *Colonial Trust Co.* v. *Lewellyn*, 12 Fed. (2d) 481. It seems to us that they are beside the point. They are all authority for the proposition that, since the power of Congress in respect of the Indians is all-embracing under the Commerce Clause of the Constitution and Congress must be left free to determine the Indian policy, any State legislation which to the slightest degree encroaches upon Federal regulation, whether by taxation or otherwise, is unconstitutional. *United States* v. *Kagama*, 118 U. S. 375; *Matter of Heff*, 197 U. S. 488; *United States* v. *Rickert*, 188 U. S. 432; *Indian Territory Illuminating Oil Co.* v. *Oklahoma*, 240 U. S. 522; *Gillespie* v. *Oklahoma*, 257 U. S. 501. Obviously, the restraint upon the States so as not to encroach upon the Federal domain is no measure of the power of Congress and no criterion of its exercise. In the Act of March 3, 1921, *supra*, Congress expressly authorized the State of Oklahoma to impose a gross production tax, and, if this be valid, can it be said that Congress has not at least authority equal to that which at its pleasure it grants to the State?

We come then to the argument that the income of the tribe is not taxable and that it is not subject to tax upon distribution to the individual members for so to tax it would be to apply the Sixteenth Amendment to new subjects. The taxability of the tribe is not before us and hence we do not consider it. We are concerned only with the tax upon the individual member when the income comes to his hand, and we have no doubt that it is taxable and reached by this statute. It is to him the fruit of his interest in the mineral rights reserved to the members of the tribe and is distributed to him quarterly. It is not unlike the distributable income from an ordinary

trust, taxable under section 219 to the individual beneficiary. See I. T. 1834, II–2, C. B. 62. To say that the Sixteenth Amendment is thus applied to new subjects is to assume that such income has not heretofore been taxable, an assumption which is inconsistent with what has heretofore been said. Since, as in *The Cherokee Tobacco*, 11 Wall. 616, the Indian has been subject to tax, so his income may be the basis of tax as is the income of all others, the Sixteenth Amendment relieving it from apportionment.

It is suggested that, since the Allotment Act of 1906 provides that the homestead land shall be nontaxable for 25 years (by the Act of 1921 extended to 1946) and the surplus lands for three years, this carries with it an exemption of income from mineral rights, the theory being that a tax upon the income is a tax upon the source, a theory said to be supported by *Pollock* v. *Farmers' Loan & Trust Co.*, 157 U. S. 429. As we have already said, the Allotment Act provides for the temporary exemption of surface lands and indicates clearly that surface lands are regarded differently from subsurface rights, as to which no exemption is provided, but as to which the State may not legislate by taxation or otherwise so as to interfere with Federal regulation. Hence, the specific exemption of the surface land, even if it were sufficient to include an exemption of the income therefrom, must fall short of application to the subsurface rights. This makes it unnecessary to consider whether, in the light of subsequent decisions like *Brushaber* v. *Union Pacific R. R. Co.*, 240 U. S. 1; *Stanton* v. *Baltic Mining Co.*, 241 U. S. 103; *Peck & Co.* v. *Lowe*, 247 U. S. 165; and other cases, the *Pollock* case compels an exemption of the source to extend to the income.

Having thus considered the several arguments advanced in derogation of the view that the plain language of the Revenue Act imposes the tax, we are brought to the conclusion that they are insufficient to warrant this Board in construing the Act as implying the exemption. Congress has had full knowledge of the questions of policy affecting Indians and that the existence of valuable mineral rights under their land requires consideration. Since *The Cherokee Tobacco* decision it presumably has been aware that as to internal taxes an express exception is needed, and yet, notwithstanding the numerous exemptions provided by section 231 of the Revenue Act, no such exception is made for the Indian. Neither the Commissioner nor this Board is authorized to supply it.

*Judgment will be entered for the Commissioner.*

MORRIS, dissenting: I dissent from the Board's opinion for the reasons hereinafter given. My opinion is based on the assumption that during the taxable years in question the United States had not entirely emancipated the Osages from guardianship. A development of the reasons underlying my conclusion necessitates a short

review of various treaties and court decisions bearing on the relationship between the United States and the Indians.

In 1803 the United States acquired the land occupied by the Osage Indians through the Louisiana Purchase. Shortly thereafter, in 1808, a treaty was entered into with the Osages defining the boundary line between the two nations and receiving, on the part of the United States, the Osage Indians under its protection. In 1815 another treaty was entered into for the purpose of reestablishing peace and friendship between the United States and the Osages. In 1818 a further treaty, under which the Osages ceded certain land to the United States, again defined the boundary between the land owned by each. In 1825 another treaty was entered into " in order to more effectually extend to the said tribes that protection of the government so much desired by them." In 1839 and 1865 additional treaties were made, in the latter of which the Osages acknowledged their dependency on the Government of the United States and invoked its protection and care.

Shortly after the Civil War, Congress considered the Indian problem, and in the Act of March 3, 1871, 16 Stat. 566; Rev. Stats., section 2079, provided:

No Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty; but no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March third, eighteen hundred and seventy-one, shall be hereby invalidated or impaired.

Since that date no treaty has been made between the United States and Indian tribes, but many agreements have been negotiated with such tribes which have been subsequently enacted into law after submission to the tribes for their approval.

Just how the question of the sale of the 600 square miles constituting, after the treaty of 1865, its reservation in Kansas was submitted to the Osage tribe, does not appear in the statutes. The Act of July 15, 1870, 16 Stat. 335, contains in section 12 a provision—

That whenever the Great and Little Osage Indians shall agree thereto, in such manner as the President shall prescribe, it shall be the duty of the President to remove said Indians from the State of Kansas to lands provided or to be provided for them for a permanent home in the Indian Territory, to consist of a tract of land in compact form * * * to be paid for out of the proceeds of the sales of their lands in the State of Kansas.

The Deficiency Act of March 3, 1873, 17 Stat. 530, 538, contains this provision:

Indian Bureau—That the Secretary of the Treasury is hereby authorized and directed to transfer from the proceeds of sale of the Osage Indian lands in Kansas, made in accordance with the twelfth section of the Act of Congress approved July 15, 1870, the sum of one million six hundred and fifty thousand

six hundred dollars, or so much thereof as may be necessary, to pay for lands purchased by the Osages from the Cherokees, and to place the same on the books of his Department to the cerdit of the Cherokee Indians.

Pursuant to said Act, the United States, in 1883, purchased in trust for the use and benefit of the Osages, out of funds derived from the sale of their lands in Kansas, certain tracts in what was then known as Indian Territory, from which lands the tribe now receives its mineral rights.

The treaties and acts which have been referred to herein, although not covering all the treaties between 1803 and 1865, establish the dependence of the Osage tribe upon the United States and the acceptance by the latter of that guardianship as well as the trust relation which existed between the two. That relation is even more clearly defined in various court decisions affecting the Indians. In *Cherokee Nation* v. *Georgia*, 5 Pet. 1, Mr. Chief Justice Marshall said:

They look to our government for protection; rely upon its kindness and its power; appeal to it for relief to their wants; and address the president as their great father. They and their country are considered by foreign nations, as well as by ourselves, as being so completely under the sovereignty and dominion of the United States, that any attempt to acquire their lands, or to form a political connection with them, would be considered by all as an invasion of our territory and an act of hostility.

In *La Motte* v. *United States*, 254 U. S. 570, 575, the court, in referring to the Osages, said:

The Osages have not been fully emancipated, but are still wards of the United States. The restrictions on the disposal and leasing of their allotments constitute an important part of the plan whereby they are being conducted from a state of tribal dependence to one of individual independence and responsibility; and outsiders, such as the defendants, are bound to respect the restrictions quite as much as are the allottees and their heirs. Authority to enforce them, like the power to impose them, is an incident of the guardianship of the United States.

See also *United States* v. *Kagama*, 118 U. S. 375; *United States* v. *Rickert*, 188 U. S. 432; *United States* v. *Sandoval*, 231 U. S. 28; *Winton* v. *Amos*, 255 U. S. 373.

This historical background now brings me to the act under which the decedent received the payments which are here in controversy; namely, the Act of June 28, 1906, 34 Stat. 539, the important provisions of which are set forth in the majority opinion. It will be noted that of the three selections, one designated a homestead was made inalienable and nontaxable for 25 years or until otherwise provided by Congress; the others were known as " surplus lands " and were made inalienable for 25 years and nontaxable for three years, except that power was vested with the Secretary of the Interior to issue to any adult member, upon his petition, a certificate of competency authorizing him to sell all his surplus lands, upon the issue

of which all of his surplus lands became taxable immediately. All minerals were reserved to the tribe for 25 years from and after April 8, 1906, which reservation has been subsequently extended to April 7, 1946. Act of March 3, 1921, 41 Stat. 1249. There are no provisions in the Act concerning the taxation of the reserved mineral interest or of the income therefrom upon distribution of the same to the members of the tribe, as provided for therein.

I agree that Congress may tax the income of the Indians. The courts have held that the authority of Congress over Indian tribes and their reservations is complete. In *Lone Wolf* v. *Hitchcock*, 187 U. S. 553, 565, the court said:

Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one, not subject to be controlled by the judicial department of the government.

The same question was raised in the United States District Court for the Western District of Pennsylvania, in the recent case of the *Colonial Trust Co.* v. *Lewellyn*, 12 Fed. (2d) 481, in which the court said:

The question of the limitation of the power of Congress to levy such a tax, if it definitely attempted to legislate for that purpose, is not involved in this controversy. Over taxation Congress has almost unlimited power, and I am not prepared to say that under such power it could not levy a tax upon the lands of its ward, or the proceeds derived from those lands.

The Board has construed the language of section 210 of the Revenue Act of 1918, wherein a tax is imposed upon the net income of every individual as being applicable to the decedent. It would seem that the words " every individual " are all-inclusive. Considering the provisions of the statute, however, in connection with the relation between the United States and the Osage Indians, and the court decisions affecting the Indians, it is my opinion that the income in question is not taxable thereunder. As already pointed out, the attitude of the Government toward the Indians has been that of protector or guardian and ward. The Attorney General commented on the growth of that relation in his opinion of March 20, 1925, 34 Ops. Atty. Gen. 439, on the question of the taxability of the income of Quapaw Indians, derived from their restricted lands, in the following language:

Our policy toward the Indian is one that has been gradually and carefully developed from the very beginning of our government, and is recorded in treaties, statutes and numerous court decisions as well as in departmental rules and regulations not inconsistent therewith. It results from the evolutionary process growing out of the relations between the Indian and an altruistic nation acquiring, as a matter of necessity, the domain of an uncivilized and untutored people. See *The Kansas Indians*, 5 Wall. 737, 752, *et seq.* As the Indian's land was needed for the expansion of our nation, it was obtained from him

by negotiation—or, in the case of extreme necessity, by the use of force. Because the Indians could not adjust themselves to our mode of living, they were made the objects of our solicitude as a weak and helpless people. As we crowded them back into the wilderness, they were concerned about, and stipulated into their treaties provisions to secure to them, a permanent home which should be free from interference by any one. During such negotiations there was always taken into account the fact that the Indian was the original proprietor of the soil. And when at the solicitation of our Government he withdrew to more remote regions, there was usually attached the condition that in his new location he should be free from the dominating influence of the white man. It was not the Indian's policy, in removing barriers, to give the white man unconditioned admittance.

Based upon that policy and the responsibility of protecting the interests of the Indians, there has developed a line of decisions construing liberally both the treaties and statutes affecting them. *Choctaw Nation* v. *United States*, 119 U. S. 1; *United States* v. *Choctaw, etc., Nations*, 179 U. S. 494; *Seufert Bros. Co.* v. *United States*, 249 U. S. 194; *Starr* v. *Long Jim*, 227 U. S. 613; *United States* v. *Payne*, 264 U. S. 446; *Cherokee Intermarriage Cases*, 203 U. S. 76; *United States* v. *Celestine*, 215 U. S. 278; *Choate* v. *Trapp*, 224 U. S. 665. In the last named case, at page 675, the court reiterated the rule of construction which has been announced as to the treaties and agreements with these people, and applied it to legislation, using the following language:

The construction, instead of being strict, is liberal; doubtful expressions, instead of being resolved in favor of the United States, are to be resolved in favor of a weak and defenseless people, who are wards of the nation, and depend wholly upon its protection and good faith. This rule of construction has been recognized, without exception, for more than a hundred years and has been applied in tax cases.

* * * In view of the universality of this rule, Congress is conclusively presumed to have intended that the legislation under which these allotments were made to the Indians should be liberally construed in their favor in determining the rights granted to the Choctaws and Chickasaws.

Not only have the courts favored them through a liberal construction of treaties and acts directly pertaining to them, but they have also held that, concerning Indian reservations, Indian lands and Indian affairs generally, Congress habitually acts only by legislation expressly and specifically applicable thereto. *Missouri Kansas & Texas Ry. Co.* v. *Roberts*, 152 U. S. 114, 119. This is true historically and the fact is one of necessity because Indians, and especially tribal Indians, remain a people apart, for whom it is impracticable to legislate in terms common to them and the whites. *Ex parte Crow Dog*, 109 U. S. 556, 571. It is well established that general acts of Congress do not apply to Indians unless so worded that they clearly manifest an intention to include them in their operation. *Elk* v. *Wilkins*, 112 U. S. 94. The Revenue Act in question is general legislation and there is no reference therein to Indians. The Allotment Act of 1906

carried certain definite provisions respecting the taxation of the property divided, and, had Congress intended by the Revenue Act of 1918 to change the provisions of that Act, it seems clear to me that it would have done so in express terms. Even those provisions indicate an intention not to tax the income received by the individual Indian from the tribal property. The only provisions made in said Act with reference to the taxability of segregated property were those as to the homestead allotment after 25 years and the surplus allotment after three years. No provision was made for the taxing of the tribal property or the income therefrom. Under the well established rule of law that the inclusion of certain things for a certain purpose excludes all other things for the same purpose, it seems clear that Congress did not intend at that time that the income from the tribal resources should be taxed.

The argument that the words "every individual" include the Indians was considered by the Attorney General in his opinion on the Quapaw Indians, 34 Ops. Atty. Gen. 439. With reference thereto, he said:

At any rate, I am unable, by implication, to impute to Congress under the broad language of our Internal Revenue Acts an intent to impose a tax for the benefit of the Federal Government on income derived from the restricted property of these wards of the nation; property the management and control of which rests largely in the hands of officers of the Government charged by law with the responsibility and duty of protecting the interests and welfare of this dependent people. In other words, it is not lightly to be assumed that Congress intended to tax the ward for the benefit of the guardian.

This language is equally, and for a still stronger reason, applicable to the Osages. The Quapaws hold their lands, including minerals, individually. The minerals under the Osage reservation belong to the tribe. The Quapaws hold their land in fee; the United States holds the minerals of the Osage reservation in trust for the tribe. The Quapaw lands were largely under the control of the individual allottees. The Osage minerals are almost entirely under the control of the Secretary of the Interior. In addition to this, up to and during the year here involved, the United States held the homestead allotments of all the Osage allottees in trust for a period of 25 years after January 1, 1907. The several acts with regard to these two tribes indicate Congress considered the Quapaws much better qualified to manage their own individual business affairs than the Osages.

The majority feel that they are bound by the decision of the Supreme Court in *The Cherokee Tobacco*, 11 Wall. 616. I am of the opinion that that case is clearly distinguishable and not determinative of the issue here involved. The tenth article of the treaty of 1866 with the Cherokees, 14 Stat. 799, reads:

Every Cherokee and freed person resident in the Cherokee nation shall have the right to sell any products of his farm, including his or her livestock, or

any merchandise or manufactured products, and to ship and drive the same to market without restraint, paying any tax thereon which is now or may be levied by the United States on the quantity sold outside the Indian territory.

Section 107 of the Act of July 20, 1868, 15 Stat. 167, reads as follows:

That the internal revenue laws imposing taxes on distilled spirits, fermented liquors, tobacco, snuff, and cigars, shall be held and construed to extend to such articles produced anywhere within the exterior boundaries of the United States, whether the same shall be within a collection district or not.

Soon after the passage of the Act of 1868, Elias C. Boudinot and Stand Wattie, two Cherokee Indians, established on the Cherokee Indian Reservation in Indian Territory a plant for the manufacture of tobacco, bought large quantities of tobacco, sugar and licorice, and opened up a brisk trade within the Cherokee Nation without paying the tax prescribed by section 107. They also shipped some tobacco to Arkansas on which they paid the tax. The United States seized the plant with all its fixtures and the raw and manufactured materials. Boudinot and Wattie intervened in the suit, alleging that they were the sole owners of the plant and materials, that the plant was not within any collection district, that they had complied fully with article 10 of the treaty, that section 107 of the Act of July 20, 1868, was not intended to apply to tobacco manufactured on the Cherokee Indian Reservation, and that if it was so intended it was to that extent unconstitutional. The decision was that the Indians before the court in that case were properly taxed.

It will be noted, however, that the tax therein considered was more in the nature of an excise tax for the control of the manufacture of spirits and tobacco, the regulation of which presented difficulties apart from the tax question involved, which materially influenced the court's decision as is evidenced from the following language of the opinion:

Nowhere would frauds to an enormous extent as to these articles be more likely to be perpetrated if this provision were withdrawn. Crowds, it is believed, would be lured thither by the prospect of illicit gain. This consideration doubtless had great weight with those by whom the law was framed. * * *

\*       \*       \*       \*       \*       \*       \*       \*

* * * The frauds that might otherwise be perpetrated there by others, under the guise of Indian names and simulated Indian ownership, is also a consideration not to be overlooked.

We are glad to know that there is no ground for any imputation upon the integrity or good faith of the claimants who prosecuted this writ of error. In a case not free from doubt and difficulty they acted under a misapprehension of their legal rights.

That case involved the protection of the Government against fraud and incidentally the demoralizing influence which would be exercised

among the Indians by persons who would flock to the Cherokee Reservation if the decision had been otherwise.

This proceeding deals with the income distributed quarterly to the individual Indians from property held in trust by the United States for the benefit of the tribe. In all the cases dealing with the taxation of Indian property in which the property has not been specifically reserved from taxation, the question of the right of the State to tax has depended on whether such property was held in trust for the Indian by the United States. When the fee to the property was vested in the sovereign for the benefit of the Indian, it was necessarily free from taxation unless by consent of the trustee. *The Kansas Indians*, 5 Wall. 737; *United States* v. *Rickert, supra; United States* v. *Thurston County*, 143 Fed. 287; *United States* v. *Pearson*, 231 Fed. 270. The Supreme Court has protected the Indians from State taxation by reason of the guardianship of the Government over them, and on the theory that this Federal agency would be entirely defeated by State taxation thereof. It would indeed be an anomalous situation to protect the income of the Indians from trust funds from State taxation and take it for purposes of the Federal Government. As said by the Attorney General, in his opinion dated March 15, 1924, 34 Ops. Atty. Gen. 275, 285, on the taxability of income from restricted lands of the members of the Five Civilized Tribes:

Is it consistent for it [the Federal Government] to guard this income from the State taxing power and surrender it to congressional authority? Would such procedure be consistent with its policy toward the Indian as protector and conservator?

In *Colonial Trust Co.* v. *Lewellyn, supra*, the last pronouncement of any Federal court on a similar question, in which it was held that the income of the decedent from a certain lease for oil and gas purposes from the Osage tribe of Indians under lands located in Osage County, Oklahoma, was not subject to the Federal income tax, the court said:

It is clear that, if the government levied a tax which the Indians were either unable or unwilling to pay, involuntary sale of the property would result. It would seem that to incumber the lands of its ward by the lien or burden of taxes would be wholly inconsistent with its trust to protect the property of the tribe from all forms of alienation and incumbrance. Under the character of the trust existing between the government and the Osage Tribe, it would seem impossible for the former to subject the lands of the latter to taxation without a clear violation of the trust which it owes to its comparatively· defenseless wards.

A more cogent reason, however, why *The Cherokee Tobacco* is not controlling of the issue herein involved is the wording of the

section under which the case arose. The tax was imposed on certain commodities produced " anywhere within the exterior boundaries of the United States," and in order to make the geographical designation more specific the words " whether the same shall be within a collection district or not," were added. There is no doubt that the language was all-inclusive and as specific as it could be without a detailed enumeration of the territories intended. There were few areas within the exterior boundaries of the United States which were not within a collection district, among which were the Indian territories. The court held " the language of the section is as clear and explicit as could be employed. It embraces indisputably the Indian territories." In my opinion, the minority view of the court in that case is not based on the proposition that general legislation does not apply to the Indians, but that a special exemption granted them can not be repealed by a subsequent general law, and particularly, when such exemption is granted by a treaty, must the exempt jurisdiction be expressly mentioned in order to be affected.

According to the foregoing views the judgment should be for the petitioner.

GREEN, LANSDON, MILLIKEN, PHILLIPS, and SMITH concur in this dissent.

MARQUETTE and VAN FOSSAN not participating.